**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| THE HONORABLE REVEREND KENNETH L. SIMON, ET AL | : : | CASE NO.  4:22-cv-612 |
| PLAINTIFFS | : : | RELATED CASE NOS. 2:21-CV-2267 AND 4:88-CV-1104 |
| | : | |
| VS. | : : | JUDGE JOHN ADAMS |
| GOVERNOR MIKE DEWINE, ET AL. | : : | "THREE-JUDGE PANEL REQUESTED" |
| DEFENDANTS. | : : | |
| | : | "CLASS-ACTION ALLEGATIONS" |
| | : : | "CLAIM OF UNCONSTITUTIONALITY" |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT
COMBINED MOTION TO DISMISS AND REPLY TO MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER, PRELIMINARY INJUNCTION, PARTIAL SUMMARY JUDGMENT,
AND IMMEDIATE APPOINTMENT OF A SPECIAL MASTER**

Defendants' Joint Combined Motion to Dismiss and Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, Partial Summary Judgment and Immediate Appointment of a Special Master. ECF Docket #15 is without merit, should be rejected and Plaintiffs' motion for a three judge court granted. Defendants have alleged that the relief sought by Plaintiffs is barred by the doctrine of laches, Plaintiffs' inability to satisfy the <u>Gingles</u> preconditions to relief under §2 of the Voting Rights Act of 1965, as amended 52 U.S.C. §10301, et seq. and Plaintiffs' failure to state cognizable claims under §3 of the VRA and both the 14th and 15th Amendments. Defendants' arguments are baseless. Plaintiffs are entitled to an injunction, the immediate appointment of a three judge court and class certification. Plaintiffs have stated claims under the VRA and the 14th and 15th Amendments. Moreover, the allegation that Plaintiffs

have not diligently pursued their claims, ignores Plaintiffs' active participation in every step of the redistricting process from the initial regional hearing in July 2021 in Youngstown, Ohio until the filing of this action. Support for these assertions is below.

Plaintiffs, the Honorable Kenneth L. Simon, the Honorable Lewis W. Macklin, II and Helen Youngblood, (hereinafter "the Simon Parties"), have moved this Honorable Court for an immediate order enjoining Defendants, their agents and successors in office, and all persons acting in concert with them from issuing certificates of nomination or election for representative of the proposed 6th Congressional District, or any district that touches  the 6th District and requires  reconfiguration as a result of the 6th District's unconstitutionality.  Plaintiffs have also requested an immediate order under Fed. R. Civ. P. 53 appointing a special master to assume control of the Ohio  Congressional redistricting process, to assure compliance with Ohio and federal law and to expedite completion of the redistricting process  in a manner to avoid further election chaos attributable to willful violation of law by Defendants

The exceptional step of the appointment of a master should be taken for the reason Defendants have intentionally ignored their duty under 52 U.S.C. §10301, et seq. to consider racial demographics and to consider whether the totality of circumstances applicable to proposed Ohio Congressional districts  results in the political processes leading to nomination or election not being equally open  to participation by Plaintiffs' putative class and whether they have less opportunity to elect representatives  of choice. The districts proposed by Defendants  unlawfully dilute the voting strength of plaintiffs' putative class.

In this case Defendants consciously ignored the VRA. They also ignored the opinion in <u>Armour v. Ohio</u>., 775 F. Supp. 1044 (N.D. Ohio 1991), which documents a

history of intentional racial discrimination in redistricting by the State of Ohio in Plaintiffs' geographic area and evidence of continued racially polarized voting. The testimony of defendants chief map maker, Mr. Di Rossi, and the comments of President Huffman and Speaker Cupp are proof that Defendants failed to comply with the VRA and have as a result drawn district maps that dilute the voting strength of Plaintiff's putative class aside from violating state law.

Plaintiffs in this action have filed a complaint that alleges five members of the Ohio Redistricting Commission and the Redistricting Commission intentionally violated Sections 2 and 3 of the Voting Rights Act 52 U.S.C. §10301, et seq in connection with the proposed configuration of Ohio Congressional districts. The proposed Congressional Districts dilute Plaintiffs' voting strength by submerging Plaintiffs into a racially polarized voting block of voters located in several racially polarized voting counties south of Mahoning County and stretching over 165 miles, counties with negligible number of Black voters while a district proposed by Plaintiffs would contain over 250,000 Blacks voters and enabled Plaintiffs to elect a representative of choice. For instance Carroll County, one of the counties Defendants propose to include in Plaintiffs' district has 72 Blacks.

Plaintiffs' motion should be granted as a threshold matter in this action for the reason Defendants have stated publicly that the challenged districts were configured without any regard whatsoever to whether the proposed districts impair Plaintiffs' ability to participate equally in the electoral process and elect representatives of choice. Defendants, despite the clear admonitions of the VRA that no voting…standard practice or procedure shall be imposed in a manner that dilutes Black voting strength and the historical findings of official racial discrimination set forth by this Court in Armour v. Ohio, 775 F. Supp. 1044 (6th Cir. 1991) concerning the role of race in elections in Mahoning County,

Ohio, adopted a wholesale policy of ignoring racial demographics in Mahoning County elections[1].  An injunction should be issued for the reason Defendants' conduct here violates the clear instruction of the United States Supreme Court concerning the procedure that should be followed to comply with §2 of the VRA.  See, <u>Thornburg v. Gingles</u>, 478 U.S. 30 (1986).  Defendants published a specific rule, Rule 9, baring consideration of racial demographics.

In <u>Thornburg</u>, the United States Supreme Court stated both amended §2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, courts, and implicitly legislative bodies configuring legislature districts, must consider the "totality of the circumstances" and determine, based "upon a searching practical evaluation of the past and present reality,' S. Rep. at 30 (footnote omitted), whether the proposed structure results in the political process being equally open to minority voters. "'This determination is peculiarly dependent upon the facts of each case,'" <u>Rogers</u>, supra, at 621, quoting <u>Nevett v. Sides</u>, 571 F.2d 209, 224 (CA5 1978), and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. 458 U.S. at 458 U. S. 622.  Defendants argue that Plaintiffs are not due for a remedy because of their inability to satisfy the <u>Gingles</u> numerosity preconditions. Defendants are wrong. Defendants are focused on an election claim. Not the type of claim ensemble.

Contrary to Defendants argument, the claim asserted her by the Simon Parties is not an influence claim that by aggregating Black voters in Mahoning and Trumbull County,

---

[1] [R]edistricting legislatures will almost always be aware of  racial demographics, but that sort of race consciousness does not lead inevitably to impermissible race discrimination.  See, <u>Shaw v. Reno</u>, 509 U.S. 630, 646.  Here defendants configured districts without any consideration of racial demographics and therefore  drew districts that failed to  take into account historical and previous judicial findings of racial block voting..

Ohio into a single Congressional District that their numbers are sufficient to prevail in a general election for a representative seat. The Simon claim, like the claim in <u>Armour</u> is a claim that the 6th Congressional District proposed will result in the process leading to <u>nomination</u> of a candidate of choice is not equally upon to the Simon parties. Defendants analysis is based on <u>Thornburg v. Gingle</u>, 478 U.S. 30 (1986), <u>Growe v. Emison</u>, 507 U.S. 25 (1993), and <u>Bartlett v. Strickland</u>, 556 U.S. 1 (2009). All involve either a challenge to a multimember district scheme in a jurisdiction, with a majority vote requirement, <u>Gingle v. Strickland</u>, or involve claims that the challenged districts resulted in inability to <u>elect</u> rather than nominate, as the Simon claim asserts here.

The Simon claim is not an "election" claim in a jurisdiction with a majority vote requirement or a limit on the number of candidates that may compete in a primary election.

The recent nomination of J.D. Vance for an Ohio U.S. Senate seat with 32.2% of the vote is proof that a majority vote is not required to nominate in Ohio. It is illogical to suggest that in order to state a §2 claim challenging the impairment of the ability to <u>nominate</u> requires a 50% <u>Gingles</u> precondition threshold to state a claim under VRA, when 50% of the vote is not required to prevail in an Ohio primary election. None of the opinions cited by Defendants dealt with a Section 2 "nomination" claim. <u>Armour</u> was not incorrect law and has never been reversed. <u>Armour</u> was a nomination claim. Proof that the <u>Gingles</u> preconditions are inapplicable to a nomination claim is for the first time in history following <u>Armour</u> a Black was nominated then elected to the 64th Ohio House District, from the Mahoning Valley.

A review of the language in <u>Gingles</u> supports Plaintiffs.

I.  <u>Gingles Precondition</u>

Section 2, as amended, 96 Stat. 134, reads as follows:

"(a) No voting qualification or prerequisite to voting or standard, *practice*, or procedure  shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(t)(2), as provided in subsection (b)."

"(b) A violation of subsection (a) is established if based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

(Emphasis added.)

_Gingles_, despite *LULAC v. Perry*, 548 U.S. 339 (2006), *Growe* or  _Strickland_ remains settled law concerning the proof required for a §2 claim.  _Gingles_ states:

*The right question…is whether "as a result of the challenged practice or structure, plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice. [Footnote 9]*

The Armour opinion provided a thorough evaluation of past reality in the Mahoning Valley. It also devised an analytical framework based upon a functional view of primary elections in the Mahoning Valley.  Armour did not involve a multimember district claim, a claim in a jurisdiction with a majority vote requirement, a claim based on a coalition of voters, or an influence claim.  Armour involved a claim concerning whether the challenged districting resulted in the political process leading to nomination, which is the decisive contest in the Mahoning Valley not being equally open.  Gingles nor its successor opinions deal with a nomination claim and no opinion cited by Defendants deals with a "nomination" claim.  Neither Simon's claim nor Armour is therefore subject to the Gingles

6

preconditions, even though as will be shown below, Simon can satisfy <u>Gingles</u> preconditions.

<u>Gingles</u> made it clear that the criteria announced were not to be applied universally. In point of fact, <u>Gingles</u> footnote 12 states:

> The claim we address in this opinion is one in which the plaintiffs alleged and attempted to prove that their ability to elect the representatives of their choice was impaired by the selection of a multimember electoral structure. We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to influence elections.

> We note also that we have no occasion to consider whether the standards we apply to respondents' claim that multimember districts operate to dilute the vote of geographically cohesive minority groups that are large enough to constitute majorities in single-member districts, and that are contained within the boundaries of the challenged multimember districts, are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

Id.

There is no authority for the proposition that a nomination claim filed in a jurisdiction without a majority vote requirement must meet the <u>Gingles</u> precondition.

The VRA prohibits the use of any redistricting method that results in the political process being unequal.  In order to comply with <u>Gingles</u> requirement to engage in a searching practical evaluation of the past reality in the Mahoning Vally with considering <u>Armour</u> and its findings concerning race.

The Simon Parties contend separating Youngstown from Warren in connection with the 6th District results in an unlawful encroachment on their right to nominate a candidate of choice. The district proposed by Plaintiffs would have a Black population of

284,938 and White population of 333,776. Only 46% of the VAP votes democratic according to the political index underlying the proposed district.  The number of Black geographically compact in the Youngstown-Warren area is sufficient to nominate a candidate of choice. Defendants focus incorrectly on election, rather than nomination.

The polarized nature of voting in the area can be gleaned readily by a review of the results of the 2020 Presidential election. Voting is clearly racially polarized. This conclusion is bolstered by the fact no Blacks have been elected to countywide office in either Mahoning or Trumbull County.  Defendants opposition reduces to the proposition that state officials have no affirmative duties under §2 of the VRA. This is not the law and it is a violation of the plain language of the Act and Gingles.

For the reasons Defendants' opposition to Plaintiffs motion for an injunction should be rejected.

The Voting Rights Act violations complained of herein were not  innocent mistakes. Defendants were fully  aware of their duties under the VRA, but conspired to intentionally ignore the previous finding of this Court in Armour  and the clear language of Section 2 in favor of partisan political advantage. Defendants intentionally discriminated by ignoring Armour's 15th Amendment findings and failed to follow federal VRA methodology, which specifically harmed Plaintiffs' class in a Mahoning Valley, but also generally diluted Black voting power across Ohio.

The specific intentional conduct of Defendants complained of herein should operate to invalidate the March 2 Plan because, despite having been advised of the findings of this Court in Armour concerning historical racial discrimination and the duty under the VRA to engage in an intensely local appraisal of indigenous political reality in Ohio and Mahoning County and the totality of circumstances test set forth in the Senate Report

8

enacting Section 2, Defendants gave specific instructions to their staff responsible  for the drawing of district maps to disregard race, racial bloc voting or any other racial consideration  in connection with district configuration.. (See, Exhibit D to Plaintiffs TRO Motion for input provided by Plaintiffs to Defendants during redistricting.)

Further, support for this assertion is found in the following exchange that occurred during hearings before the Ohio Redistricting Commission on September 9, 2021.

> Ray DiRossi:  Urn, [00:03:30] I am Ray DiRossi and as was mentioned, I'm from the caucus staff for the Senate Majority Caucus and my colleague Blake Springhetti, caucus staff for the Ohio House Majority Caucus. Urn, co-chairs and distinguished members of the Redistricting Commission, it's great to be with you today.

> Sykes:        Uh, thank you to the co-chairs and to Mr. Springhetti and Mr. DiRossi. Thank you, uh, for the work that you put together, uh, put, so you could present to us to get, today. Excuse me. Uh, my question is specific to, urn, how this current map complies with, uh, any provisions of the Voting Rights Act and what provisions of the Voting Rights Act [00:22:30] d- did you consider in constructing this map that you presented, or these maps that you presented today?

> Ray DiRossi:  Co-chairs, Leader Sykes, thank you for the question. We did not use demographic data or racial data in the production of our maps.
> Sykes: Any follow up.

> Vernon Sykes: Yes, please.

> Sykes:        Thank you for answering the question. Uh, so are there any provisions of the Voting Rights Act in which you considered while you drew the, or while you drew these maps [00:23:00] before us today?

> Ray DiRossi: I guess I would ... Co-chairs I guess I would say it on my previous statement, we did not use racial data or demographic data for the map, but we feel that the map complies with all the provisions of the Ohio Constitution.

> Sykes: Thank you. Uh, I appreciate your answer, and I, I certainly appreciate the brevity of it. Uh, can you explain why you didn't consider any parts of the Voting Rights Act in your consideration of these maps [00:23:30] before us today?

Ray DiRossi:  Well, I said we didn't consider racial data or demographic data in our maps, but we were directed not to use that data by the legislative leaders, and so we did not use it.

Audience:        (laughs)

Vernon Sykes:  Yeah. [inaudible 00:23:46].

Sykes:         So I, I would count myself as a legislative leader and I don't think that I shared that information with you and I, this is not an ambush, this is simply a question. The Voting Rights Act is certainly, uh, a part of our, uh, [00:24:00] election and electoral fabric. Uh, and so really just trying to get a better idea of how we are, or not in compliance with that, with these maps. So, urn, hopefully we can have some deeper conversations about that, but, but again, thank you for your responses.

Ray DiRossi:  Thank you.

See, Exhibit C, DiRossi Transcript, pp. 789-790. Also see, Exhibit D to Plaintiffs TRO Motion for comments by President Huffman and Speaker Cupp concerning refusal to consider racially polarized voting and racial demographics.

This testimony is clear evidence that the legislative leadership in Ohio intentionally disregarded whether the proposed districts diluted Black voting strength or the existence among other things, of racial block voting.

According to Mr. DiRossi, the lead representative for defendants in the redistricting process, the Defendants intentionally decided to ignore race, and the Voting Rights Act, but also previous judicial findings of official racial discrimination in legislative districting in Ohio.  The approach to redistricting followed the Defendants, results in vote dilution, because it ignores preexisting judicial findings in Armour of racial block voting and the Senate Report factors discussed in Armour.

## A.  **VOTING RIGHTS ACT**

Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a

language minority group. "The essence of a § 2 claim is that a certain electoral laws, practices, or structures interact with social and historical conditions to cause an inequality in the opportunities enjoyed by protected voters to elect their preferred representatives." Gingles, 478 U.S. at 47. Defendants failed to determine whether the proposed districts caused inequality despite a permanent injunction from Armour and the duty to consider the totality of circumstances. This threshold failure by Defendants warrants the entry of summary judgment on Plaintiffs' VRA claim.

### A.    TIMELINESS - LACHES

The Simon Parties exercised appropriate diligence in connection with their challenge to the current proposed Ohio 6th United States Congressional District.  On the very first day of Regional  hearings concerning the current redistricting process, August 23, 2021, Plaintiff, Reverend Kenneth L. Simon and Undersigned Counsel appeared before the Ohio Redistricting Commission and presented a proposed map for a new congressional district for the Ohio Mahoning Valley. Exhibit E. ECF Docket #147-4, on September 14, 2021, counsel for Simon Parties appeared before the Ohio Redistricting Commission, and again presented a proposed Congressional Map on September 15, 2021. See, Exhibit F – Transcript of September 15, 2021 hearing.

Because the Congressional District proposed by Defendants was adopted pursuant to a policy which gave no consideration to racial demographics, the testimony of the Simon Parties at Redistricting Hearings, the fact that the Court in Armour had found intentional violations of the 15th Amendment in Armour, violation of a VRA and the geographic area within by the proposed 6th Congressional District had a history of 14th and 15th Amendment violations, as discussed in the Armour Opinion, the Simon Parties filed an action in United

11

States District Court for the Northern District of Ohio, as a case related to *Armour*, eleven days later December 1,2021, Case No. 4:21-cv-2267.

On December 13, 2021, the Simon Parties moved in the N.D. Ohio for Class Certification and a three judge district court. On December 21, 2021 Defendants moved to stay. On January 3, 2022, the Simon Parties moved the N.D. Ohio Court for an injunction prohibiting elections under the proposed 6th District Plan. On January 4, 2022, the Simon Parties filed opposition to Defendants' Motion to Stay. On January 12, 2022 the N.D. Ohio action was stayed, at the request of Defendants, in difference to litigation in the Ohio Supreme Court. On January 14, 2022 the Ohio Supreme Court invalidated the November 20, 2021 Congressional Plan.

On February 21, 2022, in order to preserve this status under the first-to-file rule, the Simon Parties moved to Intervene in this action. On March 2, 2022, Defendants approved a new Congressional Plan.

The March 2, 2022 Plan suffered from the same defects as the November 20, 2022 Plan.  On March 23, 2022 the Simon Parties filed a Complaint in the S.D. Ohio challenging the March 2, 2022 Plan.

On March 29, 2022 in State Court litigation the Ohio Supreme Court deferred a ruling on the validity of the March 2, 2022 Congressional Plan. On March 30, 2022 the Simon Parties moved to enjoin the March 2, 2022 Congressional Plan.

The current cycle of submission and rejection in the Ohio Supreme Court illustrates an unfortunate flaw in the Ohio redistricting process. In order to preclude an action in federal Court, the State should have an adequate state remedy available, Ohio does not. The current redistricting fiasco is evidence of that. In addition, the Simon Parties seek relief under the VRA based in part, on a previous federal Court order, Armour, and history of

violations of the 14th and 15th Amendments.  In other words the Simon Parties seek "Bail-In" relief under §3 of the VRA as well as relief under Sec 2.

Section 3 relief was sought initially by the Simon parties  in the Court where the previous relief was accorded, the ND Ohio.

 Accordingly a recent opinion in <u>League of Women Voters v. Lee</u>, Case No 4:21-CV-186 ND Florida: Section 3(c) of the VRA states "Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote," Section 3(c) provides additional remedies for Plaintiffs who have successfully challenged voting restrictions under the Fourteenth or Fifteenth Amendments. Under section 3(c), if a Court finds that a "political subdivision" has committed intentional race discrimination in voting, it "shall retain jurisdiction for such period as it may deem appropriate." 52 U.S.C. § 10302(c).

Case No. 4:21-cv-186 states:  Section 3(c) is "[a] hybrid of sections 2 and 5" of the VRA. Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance,* 119 Yale. L. J. 1992, 2006 (2010). "Section 3 authorizes courts to impose preclearance in response to violations of the Fourteenth and Fifteenth Amendments." *Id*.; see also Pub. L. No. 89-110, § 3(c), 79 Stat. 437, 437-38 (1965). Congress designed section 3(c) "to deal with denials or abridgments of the right to vote in so-called 'pockets of discrimination'—that is, areas outside the States and subdivisions to which the prohibitions of section 4(a) are in effect." H.R. Rep. No. 80-439, at 23 (1965). Section 3(c) was intended to supplement sections 4 and 5 "by providing for judicial scrutiny of new or changed voting requirements, [and] to insure against the erection of new and onerous discriminatory voting barriers by State or political subdivisions which had been found to have discriminated." Just as courts can "bail out" states that have stopped

discriminating, they can "bail in" states who have recently discriminated, but who were not already subject to preclearance.

Section 3(c) allows preclearance; in that way, it resembles sections 4 and 5. But section 3(c) does not raise the same constitutional concerns raised  in Shelby County. Unlike section 4, section 3(c) does not sort jurisdictions into categories based on their long-past history of discrimination. While "section 4's coverage … required[] preclearance in jurisdictions with histories of racial discrimination in voting dating back to the 1960s and 1970s," section 3(c) "requires a court to find—or a jurisdiction to admit—a constitutional violation." Crum supra, at 2009. Put another way, rather than rely "on decades-old data relevant to decades-old problems" section 3(c) relies on the most up-to-date data possible. Shelby Cnty., 570 U.S. at 553.

Jeffers v. Clinton, 740 F. Supp. 585 (E.D. Ark. 1990), is the seminal case interpreting the section. There, a three-judge district court panel imposed a preclearance requirement on Arkansas after determining that it "ha[d] committed a number of constitutional violations of the voting rights of black citizens." *Id* at 586. With a few caveats, this Court finds the Jeffers, courts first ask "whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State." Perez v. Abbott, 390 F. Supp. 3d 803, 813 (W.D. Tex. 2019). On this point, Jeffers explained that "more than one violation must be shown." 740 F. Supp. at 600. But there are reasons to doubt this conclusion. For one, it "runs counter to statutorily mandated rules of construction." Crum supra, at 2007 n.88; 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the plural include the singular …"). Plus, "any statute that violates the Fifteenth Amendment necessarily violates countless citizens' Fifteenth Amendment rights." Crum supra, at 2007

14

n.88. At any rate, because this Court already found that, over the past 20 years, Florida has repeatedly targeted Black voters because of their affiliation with the Democratic party, this Court need not resolve this issue. The first Jeffers factor is met.

Next, under Jeffers, courts ask whether "the remedy of preclearance should be imposed." Perez, 390 F. Supp. 3d at 813. Recall that the statute says that this Court, upon finding a Fifteenth Amendment violation, "shall retain jurisdiction for such period as it may deem appropriate." 52 U.S.C. § 10302(c) (emphasis added). Jeffers reasoned that the word "shall" in section 3(c) does not strip courts of their discretion. 740 F. Supp. at 600 (stating that [i]t is standard doctrine that statutes stating that courts 'shall' grant equitable relief upon the occurrence of a certain state of affairs are not literally construed"). This Court questions whether courts may so casually disregard an express directive from Congress. See Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) ("The . . . instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion."). Still, because this Court finds that equity favors imposing preclearance, it need not decide whether "shall" really means shall.

Having determined that courts may exercise discretion in deciding whether to award 3(c) relief, Jeffers set out a series of non-exhaustive factors to guide that discretion. 740 F. Supp. at 601. These factors include (1) whether "the violations [have] been persistent and repeated," (2) whether the violations are "recent or distant in time," (3) whether preclearance would prevent future violations, (4) whether the violations have "been remedied by judicial decree or otherwise," (5) whether the violations are likely to recur, and (6) whether "political developments, independent of this litigation, make recurrence

15

more or less likely." *Id*. Given the <u>Jeffers</u> factors Defendants had a duty to at least look at and consider the Simon parties' racial data.

### 1.    LIKELIHOOD OF SUCCESS ON THE MERITS

The Simon Parties are likely to succeed on the merits of their VRA claim because the Simon Parties satisfy the first <u>Thornbury v. Gingles</u>, 478 U.S. 30 106 S. Ct. 2752 (1986) precondition, a threshold showing that the minority group is sufficiently large and geographically compact nominate in a single member district.

<u>Gingles</u> arose in the context of a North Carolina challenge to a multi member districting scheme. There was also a general election run off requirement, unlike Ohio where in a plurality will suffice to win an election for U.S. Representatives.

The Court in <u>Gingles</u> stated expressly it was not deciding which standards apply to other types of claims of establishing a bright line rule. The Court stated:

> We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to influence elections.

> We note also that we have no occasion to consider whether the standards we apply to respondents' claims that multi-member districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of challenged multi-member districts, are fully pertinent to other sorts of vote-dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

> In a different kind of case, for example a gerrymander case, plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multi-member or single member districts, with the effect of diluting the potential strength of the minority vote. *1052 Id. at 46 D. 12,106 S. Ct. at 2764 n. 12; at 50 n. 16, 1.06 S. Ct. at 276711. 16. (emphasis added).

Here the size and scope of the Simon Class has yet to be determined. However, the Simon Parties submitted a proposed District to the Defendants on September 16, 2021, Exhibit F to their Motion, that suggests a district where Black voters would satisfy the first *Gingles* precondition.

According to the 2020 Census, Ohio's current population is 11, 779, 488. See, *2020 Census*, P.L. 94-171. An Ohio Congressional district will have a representative ratio of 1:787,527 citizens. The Simon Parties proposed a district, as indicated at Exhibit F, that instead of separating the Black community in Warren, Ohio, from the Black community in Youngstown, Ohio, two communities that have historically belonged to the same media market and standard metropolitan statistical area, due to the linkage of their histories and economics, or submerging these communities into areas south of Mahoning County, the county where Youngstown is located, the district should extend west or northwest to include additional voters with similar interests. In this manner extremely polarized racial voting will be avoided. A Black has never been elected to county wide office in Mahoning or Trumbull County

Under the districts proposed by the Simon Parties the total voting aged white population is 333,776. The total voting aged Black population is 284,338. When this total voting block is further divided by political party, which would be required in a *Gingles* threshold condition analysis, the Simon Parties class would be sufficiently large a geographically compact to prevail in a single member election. The data in Exhibit F was compiled by Dr. Mark J. Sallings, Maxine Goodman Levin College of Urban Affairs, Cleveland State University.

The Simon Parties do not merely seek relief under §2 of the VRA. Relief is also requested under §3, due to the history in northeast Ohio as a "pocket of discrimination."

In Youngstown alone, violations of the 15th Amendment in districting was found in <u>Armour</u> aside from *Armour*, violations of the Fourteenth Amendment due to racial discrimination were found in the police department. <u>Williams v. Vokovich</u>, 720 F.2d 909 (6th Cir. 1983) and in public schools <u>Alexander v. Board of Education</u>, 675 F.2d 787 (6th Cir. 1982). This is pointed out to say, even if Simon can not satisfy the requirements for relief under §2 of the VRA, the history of violation under the 14th and 15th Amendments would still entitle Simon to relief under §3 of the VRA. Most importantly, Defendants had a duty under the VRA once the Simon Parties brought this history to Defendants attention to at least consider it as requested on August 23, 2021 on the first day of Ohio Redistricting Commission hearings to "consider it."  Instead Defendants established a statewide policy of giving no consideration whatsoever to racial demographics, notwithstanding the requirements of the VRA and <u>Armour</u> being brought to their attention.

In order to avoid the need to resurrect  the shameful history of treatment of descendants of persons formerly held in bondage in the United States, slaves, the VRA focused on whether a challenged voting mechanism results in the processes leading to nomination and election not being equally open to minority voters. Defendants' policy of zero consideration of racial demographics frustrates any means to measure whether the location of a district boundary results in dilution of Black voting strength. The need to consider racial demographics in order to determine if the location of boundaries results in vote dilution was confirmed on March 29, 2022 hearing in <u>Gonadakis</u> on March 28, 2022 by Chris Glassburn, President of Project Govern in redistricting. Glassburn testified as follows concerning "results":

> Q. So given that you did have available to you, if you had elected to use it -
> - if the Commission had elected to use it, the ability to analyze the voting
> behavior of homogeneous precincts racially, the exclusion of that

information, then, would prevent you from determining whether the lines that were drawn in these districts resulted in vote dilution or not. It took that ability away from you, didn't it?

A. Without the census racial data, no, we could not look at racial data. However, we also did not have any Gingles test which is a -- which is the analyzation of racially polarized voting. We did not have any documents that suggest there was racially polarized voting that followed that Gingles criteria for any part the state.

Q. Wouldn't it be part of the analysis of the mapmakers to look at, if the racial data was available, whether or not the lines they were recommending resulted in the processes leading to nomination or election not being equally open to black voters?

A. No.

Q. How could you contend -- how could you, then, determine what the results would be of a particular configuration on black voters if you did not include that in the process of determining where these district lines would be?

A. There was no racial analysis done.

Q. So you couldn't determine the results. Would you agree with me?

A. Yes.

Q. And your failure to include those results was the result of express directions given to you by the redistricting commission. Would you agree with that statement?

A. Yes. In this round and all others.

See, Exhibit G. Transcript of Glassburn Testimony.

According to the 2020 Census 13.1% of Ohio's population is Black, 1,521,462 persons. The VRA extends protection to this group not only from the effects of historical de jure racial discrimination but also de facto. Defendants blanket refusal to even consider the history provided to them by the Simon Parties, not only injured the Simon Parties, it may have resulted in the dilution of the voting strength of Blacks in other Ohio locales

where on intensely local appraisal of indigenous political reality and searching evaluation of past and present conditions was totally ignored by Defendants.

For these reasons, the Simon Parties have requested relief not only under the VRA, but also §3 of the 14th Amendment, which basically says if a State fails to accord complete rights of suffrage to former slaves, then those former slaves do not count toward the number of elected officials  that the State is entitled to have as representatives in Congress.

In this case of Ohio, an express directive, Rule 9 on the Defendants guidance to the mapmakers and instruction to map drawers, was given by the most senior legislative officials to violate the VRA by not considering any racial demographics. This de jure discriminatory policy harmed 13% of Ohio's population, not just the Simon Parties. If Defendant's continue with this intentional disregard of §§2 and 3 of the VRA, Ohio should have its Congressional denominator reduced by 13% of the State's population, the extent to which it failed to comply with §3 of the 14th Amendment.

Defendants contend that the Simon Parties are not merely asserting an influence claim. Influence claims are not barred in the Sixth Circuit by reason of the decision in Growe v. Emison, 507 U.S. 25 (1993) and Cousins v. Sunquist, 145 F.3d 818 (6th Cir. 1998). Defendants argument is incorrect.  Growe stated explicitly "to establish a vote-dilution claim with respect to a multimember district plan, a plaintiff must establish three threshold conditions." This case does not deal with a multimember districting plan. Growe was factually similar to Gingles, both involved multimember plans. Defendants also content that an influence claim is barred by Cousins v. Sundquist, 145 F. 3d 818 (6th Cir. 1998). Although there is dicta in Cousin concerning an influence claim, the decision did not turn the size of the minority voting group Plaintiffs, the decision rested on inability to meet the third Gingles precondition, proof of racial block voting. The claim of the Simon

20

Parties is because of the duties imposed under §§2 and 3 of the VRA and the findings in Armour, the Defendants' should have considered racial demographics when drafting the 6th Congressional District.

Defendants still have a chance to reconsider the 6th District lines as litigation is ongoing in the State system concerning the March 2, 2022 map.

It bears mentioning that Defendants suggest that the Simon Parties should have joined the litigation in State court. The Simon Parties seek to vindicate and rely upon the findings in Armour as a component for their claim to §3 relief. While the Simon Parties wholly support the 2015 Amendments to the Ohio Constitution concerning redistricting, these amendments do not provide an adequate remedy due to the endless cycle of rejection and resubmission that may, and unfortunately, is occurring.

The Simon Parties became involved in this process from its outset. They are now faced with having to vote for Congressional representative in a racially discriminatory district. Given the Defendants' malfeasance in the creation of this predicament, holding final certification of the May 3 primary in abeyance pending the outcome of litigation concerning the March 2, 2022 map is a small measure of justice to the Simon Parties who to date have had their concerns relegated to back-of-the-bus status.

*Growe* does not require a different result *Growe* counseled deference to State proceedings, where the state proceedings were an adequate remedy. Ohio's State procedure, as evidenced by the current predicament is not.

Defendants also raise Purcell v. Gonzalez, 549 U.S. 1 (2006). Purcell, stated "court orders affecting elections especially conflicting orders, can themselves result in voter confusion and consequential incentive to remain away from the policy. *Id* at 4.

Primary Voting has already occurred in Ohio. Affording  the Simon Parties a remedy on the back end is not going to effect the May 3 primary. Voters are already confused  and turn out was low. These circumstances are due to Defendants' conduct. The Simon Parties do not seek to enjoin or disrupt an election; they request that unless the election is determined to be fair, the results should not be certified.

## III.    IRREPARABLE HARM

Plaintiffs have suffered and continue to suffer irreparable injuries. "Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there can be no do-over and no redress." League of Women Voters of N.C. v North Carolina, 769 F.3d 224, 247 (4th Cir. 2014). "The proper remedy for a legal provision enacted with discriminatory intent  Croson v. City of Richmond, 422 U.S.

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" Scott, 612 F.3d at 1295 (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th  Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. See, e.g., Williams v Rhodes, 393 U.S. 23,30 (1968).

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." United States v. Alabama, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th  Cir. 2010); Cunningham v. Adams 808 F.2d 815, 821 (11th Cir. 1987); see also Charles II. Wesley Educ. Found., Inc. v. Cox, 32*, Supp. 2d 1358, 1368 (N.D. Ga. 2004) (Cox I), aff'd, 408 F.3d 1349 (11th Cir. 2005) (Cox

22

II) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); see also <u>United States v. Georgia</u>, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

"Once a state legislative apportionment scheme has been found unconstitutional , it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. <u>Reynolds v. Sims</u>, 377 U.S. 533 (1964).

Some form of relief is due to the Simon Parties because the State has intentionally trampled on their fundamental voting rights or irreparable harm as a matter of law.

## IV.     HARM TO OTHERS AND PUBLIC INTEREST

Enjoining the certification of the results of an unlawful election will not cause harm to others. The Simon Parties do not seek to enjoin the election, despite having been denied access to the Courts under the guise of <u>Growe</u>.

Federal courts generally have a "'virtually unflagging'" obligation to hear and decide cases within their jurisdiction. *Sprint*, 571 U.S. at 77 (quoting *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976)). Federal courts "have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" Id. (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 1821)). "Parallel state-court proceedings do not detract from that obligation"; instead, contemporaneous federal and state litigation over the same subject matter is the norm. Id. The availability of the federal courts to adjudicate federal claims is essential to protecting federal rights especially, as relevant here, the right to vote free of intentional racial discrimination.

23

## V.     PUBLIC INTEREST

The public interest is served by enjoining certification for the reason amid the chaos created by the ongoing cycle of map rejection, voters in the Simon class will know that the irreparable harm caused an election under the current unconstitutional 6th District map may not be valid.  An injunction presents a remedy for the Simon Parties.

## B.  SUMMARY JUDGMENT IN SECTION 2 LITIGATION

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In deciding whether there is a genuine issue of material fact, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. Anderson, 477 U.S. at 255. To determine which facts are "material," a court must look to the substantive law on which the claim rests. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine issue" is one whose resolution could affect the outcome of the action. Id. In the absence of a genuine issue of material fact, the court may enter judgment against the movant if the non-movant is entitled to judgment as a matter of law. See, e.g., Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 104 (6th Cir. 1995); Markva v. Haveman, 168 F. Supp. 2d 695, 706-07 (E.D. Mich. 2001).

In Section 2 cases, summary judgment usually "presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court." Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1348 (11th Cir. 2015). Because district courts must conduct "a searching practical evaluation of the past and present reality" in a jurisdiction, Gingles, 478 U.S. at 79, and a "comprehensive, not limited, canvassing of relevant facts," De Grandy, 512 U.S. at 1011, summary adjudication

is rarely possible, see, e.g., <u>Metts v. Murphy</u>, 363 F.3d 8, 12 (1st Cir. 2004). Particularly when resolution turns on "disputed issues presented by the experts' analysis," full development of the record is often necessary. <u>Mallory v. Eyrich</u>, 707 F. Supp. 947, 054 (S.D. Ohio 1989). Unlike the usual §2 case here Defendants openly concede that they ignored the totality of circumstances. Accordingly, a VRA violation should glow automatically from that failure.

Defendants actions, the total failure to even consider race, renders the U.S. Congressional Plan invalid which warrants the issuance of a preliminary injunction.

### C. <u>TEMPORARY RESTRAINING ORDER</u>

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" state and federal officials "who are violating, or planning to violate, federal law." <u>Armstrong v. Exceptional Child Ctr., Inc</u>., 575 U.S. 320, 326-27 (2015) (citing <u>Osborn v. Bank of United States</u>, 9 Wheat. 738, 838-39 (1824); <u>Ex parte Young</u>, 209 U.S. 123, 150-51 (1908); <u>Am. Sch. of Magnetic Healing v. McAnnulty</u>, 187 U.S. 94, 110 (1902)). This power to enjoin unlawful "actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." <u>Id</u>. At 327. While Congress may prohibit courts from awarding such equitable relief, id. at 327-28, Congress need not confer the power to award such relief in order for courts to exercise that power: the power is an inherent aspect of the courts' equitable authority, see, e.g., <u>Am. School of Magnetic Healing</u>, 187 U.S. at 110; see also <u>Barry v. Lyon</u>, No. 13-cv-13185, 2015 U.S. Dist. LEXIS 174347, at *5 (E.D. Mich. June 5, 2015); In re <u>Trump</u>, 928 F.3d 360, 373 (4th Cir. 2019); <u>Int'l Refugee Assistance Project v. Trump</u>, 883 F.3d 233, 287 (4th Cir. 2018) (en banc) (Gregory, J.,

concurring); <u>Sierra Club v. Trump</u>, 929 F.3d 670, 694 (9th Cir. 2019); <u>CNSP, Inc. v. City of Santa Fe</u>, 755 F. App'x 845, 849 (10th Cir. 2019).

Courts must balance "four factors ... when considering a motion for a temporary restraining order: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." <u>City of Pontiac Retired Emples. Ass'n v. Schimmel</u>, 751 F.3d 427, 430 (6th Cir. 2014) (internal quotation marks omitted). The standard for a permanent injunction is identical, except that the movant must show "actual success on the merits" instead of a likelihood of success on the merits. <u>Amoco Prod. Co. v. Vill. of Gambell</u>, 480 U.S. 531, 546 n.12 (1987). A permanent injunction is in place here via <u>Armour</u>.  Defendants totally ignored <u>Armour</u>.

The purpose of a temporary restraining order is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." <u>United States v. Alabama</u>, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010); <u>Cunningham v. Adams,</u> 808 F.2d 815, 821 (11th Cir. 1987); see also Charles H. Wesley Educ. Found., Inc. v. Cox, 32*, Supp. 2d 1358, 1368 (N.D. Ga. 2004) (Cox I), aff'd, 408 F.3d 1349 (11th Cir. 2005) (Cox II) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); see also <u>United States v. Georgia</u>, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

As explained below, injunctive relief is warranted, because all four elements strongly weigh in Plaintiffs' favor. Plaintiffs are likely to succeed on the merits. They will suffer irreparable harm if the 2022 elections are conducted using constitutionally infirm districts. The balance of hardships weighs in favor of Plaintiffs as well: Ohioan's fundamental right to vote would be infringed absent an injunction, outweighing any burden that Defendant might experience in complying with the requested injunction. The requested injunction would serve the public interest because protecting the right to vote is unquestionably in the public interest.

## 1. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR VRA CLAIM

A claim of racial gerrymandering usually requires "a two-step analysis." Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within -or without a particular district.'" Id. (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its-race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Id. at 1464.  A compelling interest may require racially gerrymandered Districts in order to comply with the Voting Rights Act. Here, whether the race required a given district structure was totally ignored.  This act itself harmed Plaintiffs in light of the locales history, as documented in the Armour Opinion and in the subsequent history of Mahoning County that Defendants totally disregard.

## 2. IRREPARABLE INJURY

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" <u>Scott</u>, 612 F.3d at 1295 (quoting <u>Cunningham v. Adams</u>, 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. See, e.g., <u>Williams v Rhodes</u>, 393 U.S. 23, 30 (1968).

## 3. THE BALANCE OF THE EQUITIES WEIGHTS IN FAVOR OF PLAINTIFFS

The irreparable injury that Plaintiffs will suffer absent an injunction outweighs any harm Defendant will suffer if the requested injunction is granted. Plaintiffs will suffer irreparable injury to their fundamental right to vote absent an injunction. See <u>Williams v. Rhodes</u>, 393 U.S. 23, 30 (1968) ("the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms."); see also Scott, 612 F.3d at 1295 (citation omitted). By contrast, any potential harm Defendant would face under the requested injunction would be substantially less, particularly in light of the schedule this Court has set to avoid any interference with relevant pre-election deadlines.

"If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." <u>Fayette County</u>, 118 F. Supp. 3d at 1349 (quoting <u>Canal Auth. of Fla. v. Callaway</u>, 489 F.2d 567, 576 (5th Cir. 1974)). Indeed, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure

[sic] that no further elections are conducted under the invalid plan." Reynolds, 377 U.S. at 585.

### 4. PUBLIC INTEREST

The Supreme Court has long recognized that "[t]he right to vote freely for the candidate of one's choice is of essence of a democratic society and any restrictions on that right strike at the heart of representative government." Reynolds, 377 U.S. at 555; see Williams v. Rhodes, 393 U.S. 23, 30 (1968) ("[T]he right of qualified voters…to cast their votes effectively ... rank[s] among our most precious freedoms."); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (the right to vote is "preservative of all rights"). In recognition of this fundamental principle, courts have repeatedly held that an infringement on the right to vote constitutes irreparable injury. See, e.g., Dillard, 640 F. Supp. at 1363; Harris v. Graddick, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

The requested injunction would not be adverse to public interest. Plaintiffs and the citizens of Alabama have a fundamental right to "to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968) Additionally, "the protection of 'franchise-related rights is without question in the public interest,' and in such a situation, public interest is "best served by ensuring …that all citizens ... have an equal opportunity to elect the representatives of their choice." Fayette County, 118 F. Supp. 3d at 1349 (quoting x II, 408 F.3d at 1355). Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections using conditionally drawn districts and ensure that citizens of have an equal opportunity to elect the representatives of their choice; thus, the requested injunction would be in the public interest. On the contrary, allowing the 2022 election cycle to proceed with the racially gerrymandered map does not further any public interest.

It is unfortunate that Defendants chose to ignore the VRA and make it necessary to revive evidence of past racial injustices in order to demonstrate why all Senate Report factors should have been considered by Defendants when drawing district lines.

Defendants decision to not consider the racial history of Blacks and voting in Mahoning County requires resort to the type analysis the VRA was designed to avoid.

As stated in Gingles:

The Senate Report states that one reason the Senate Committee abandoned the intent test was that

"the Committee . . . heard persuasive testimony that the intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities."

S.Rep. at 36. The Committee found the testimony of Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights, particularly persuasive. He testified:

"[Under an intent test,] Mitigators representing excluded minorities will have to explore the motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief."

Ibid. (footnote omitted). The grave threat to racial progress and harmony which Congress perceived from requiring proof that racism caused the adoption or maintenance of a challenged electoral mechanism is present to a much greater degree in the proposed requirement that plaintiffs demonstrate that racial animosity determined white voting patterns. Under the old intent test, plaintiffs might succeed by proving only that a limited number of elected officials were racist; under the new intent test, plaintiffs would be required to prove that most of the white community is racist in order to obtain judicial relief. It is difficult to imagine a more racially divisive requirement.

A second reason Congress rejected the old intent test was that, in most cases, it placed an "inordinately difficult burden" on § 2 plaintiffs. Ibid. The new intent test would be equally, if not more, burdensome. In order to prove that a specific factor -- racial hostility -- determined white voters' ballots, it would be necessary to demonstrate that other potentially relevant causal

factors, such as socioeconomic characteristics and candidate expenditures, do not correlate better than racial animosity with white voting behavior. As one commentator has explained:

"Many of the[se] independent variables . . . would be all but impossible for a social scientist to operationalize as interval-level independent variables for use in a multiple regression equation, whether on a step-wise basis or not. To conduct such an extensive statistical analysis as this implies, moreover, can become prohibitively expensive."

"Compared to this sort of effort, proving discriminatory intent in the adoption of an at-large election system is both simple and inexpensive."

Dilution Lawsuits, 28 How.L.J. 463, 492 (1985) (footnote omitted).

The final and most dispositive reason the Senate Report repudiated the old intent test was that it "asks the wrong question." S.Rep. at 36. Amended § 2 asks instead "whether minorities have equal access to the process of electing their representatives." Ibid.

Focusing on the discriminatory intent of the voters, rather than the behavior of the voters, also asks the wrong question. All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations. Moreover, as we have explained in detail, supra, requiring proof that racial considerations actually caused voter behavior will result -- contrary to congressional intent -- in situations where a black minority that functionally has been totally excluded from the political process will be unable to establish a § 2 violation. The Senate Report's remark concerning the old intent test thus is pertinent to the new test: the requirement that a "court . . . make a separate . . . finding of intent, after accepting the proof of the factors involved in the <u>White [v. Regester</u>, 412 U. S. 755] analysis . . . [would] seriously clou[d] the prospects of eradicating the remaining instances of racial discrimination in American elections."

### D.  SPECIAL MASTER

The Simon Parties move under Fed. R. Civ. P. 53 for the appointment of a Special Master to complete the task of redistricting in a manner consistent with the Orders of the Ohio Supreme Court, the Ohio Constitution and the VRA, measures that Defendants have elected to intentionally ignore. The state is not entitled to multiple opportunities to remedy its unconstitutional districts. See, <u>Reynolds v. Sims</u>, 377 U.S. 533, 585-87 (1964) (affirming remedial districting map drawn by a district court after district court found state

legislature's first proposed remedial map failed to remedy constitutional violation). Additionally, the fast approaching election deadlines necessitates an expedited schedule. In light of the need for an expedited schedule, the multiple opportunities for Defendants to approve lawful plans, and the fact experts have been engaged by Defendants to draft lawful plans, this Court should assume control of the process recently established by the State by appointing the experts the State has engaged and paid as Special Masters. The Sixth Circuit has also made two mediators available.  It is comparable to the approach  followed in similar cases. See Order, <u>Personhuballah v. Alcorn</u>, No. 3:13-cv-678, Doc. No. 241 (E.D. Va. Sept. 25, 2015) (appointing special master approximately three weeks after first notifying parties of its intent to appoint to appoint special master); see also Order, <u>Personhuballah v. Alcorn</u>, No. 3:13-cv-678, Doc. No. 207 (E.D. Va. Sept. 3, 2015) (notifying parties of intent to appoint special master). In view of upcoming elections and upon consideration of the technical nature of determining an appropriate remedy when district lines are at issue, exceptional circumstances exist for appointment of a Special Master pursuant to Federal Rule of Civil Procedure 53. The Special Master should assist the Court in further evaluating and redrawing the Subject Districts by developing an appropriate plan remedying the constitutional violations that render the present Districts legally unacceptable.

### E.  SECTION 2 OF THE 14TH AMENDMENT

Plaintiffs argument under the 14th Amendment is simply that under §2 of that Amendment, Ohio should be penalized for its intentional disregard of the number of Black voters in the state.  See, <u>Sanders v. Wilkins</u>, 152 F. 2d 235 (4th Cir. 1945).

Section 2 of the 14th Amendment states:

But when the right to vote at any election . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

## F.  FIFTHEENTH AMENDMENT

Defendants' 15th Amendment argument is without merit as the VRA violation described above while resulting in the nomination process and being equally open, was also intentional.

## G.  CONCLUSION

For the above reasons, partial summary judgment should be entered in favor of Plaintiffs, and granting the request of a temporary restraining order and preliminary injunction, and appointing a special master appointed.

/s/ Percy Squire_____
Percy Squire (0022010)
Percy Squire Co., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
(614) 224-6528, Telephone
(614) 224-6529, Facsimile
psquire@sp-lawfirm.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served by operation of the United States District Court, Northern District of Ohio electronic filing system, on May 20, 2022.

/s/ Percy Squire_____
Attorney for Plaintiff (0022010)