**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| REVEREND KENNETH L. SIMON, *et al*., | CASE NO. 4:22-CV-00612 |
| Plaintiffs, | |
| | JUDGE JOHN R. ADAMS |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| MIKE DEWINE, *et al.*, | |
| Defendants. | **REPORT & RECOMMENDATION** |

The Court has referred Defendants' motions to dismiss (ECF Docs. 15 & 18) to the undersigned for a report and recommendation.  (ECF Doc. 25.)   For the reasons set forth herein, the undersigned recommends that the Court **GRANT** Defendants' motions to dismiss (ECF Doc. 15; ECF Doc. 18) because Plaintiffs have failed to state a claim for relief under § 2 of the Voting Rights Act or under the First, Fourteenth, and Fifteenth Amendments.

Also pending before the Court are Plaintiffs' Motions for a Three Judge Court (ECF Doc. 2), for Class Certification (ECF Doc. 3), and for Temporary Restraining Order, Preliminary Injunction, Partial Summary Judgment, and Immediate Appointment of a Special Master (ECF Doc. 4).  Those motions are beyond the scope of the Court's referral order (ECF Doc. 25) and accordingly are not addressed in this Report and Recommendation.  Nevertheless, the undersigned acknowledges the statutory requirement that "[a] district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of

congressional districts. . . ." 28 U.S.C. § 2284(a). Although a district court may enter judgement as to "wholly insubstantial and frivolous" claims meeting the definition in § 2284(a), the Supreme Court has rejected the argument that pleadings which fail to state a claim upon which relief may be granted are "*by definition . . . insubstantial* and so properly . . . subject to dismissal by the district court without convening a three-judge court." *Shapiro v. McManus*, 577 U.S. 39, 45 (2015) (emphasis in original) (citation omitted).

While this Report and Recommendation addresses only whether Plaintiffs have stated claims upon which relief may be granted, the undersigned observes that it would not be inconsistent with the findings set forth herein for the Court to further conclude that Plaintiffs' three constitutional claims – in the Second, Third, and Fourth Claims for Relief – are "wholly insubstantial and frivolous" such that the Court need not refer the matter to a three judge panel.

## I.     Parties

Plaintiffs in this action are the Honorable Reverend Kenneth L. Simon, the Honorable Lewis W. Macklin, II, and Helen Youngblood, black registered voters in Mahoning County, Ohio. (ECF Doc. 1, pp. 6, 10-11, ¶¶ 11, 27.) They also allege that they are members and successor representatives of the class of African American voters certified in the case of *Ezell Armour v. State of Ohio*, 775 F. Supp. 1044 (N.D. Ohio 1991). (*Id.*)

Defendants in this action are the Ohio Redistricting Commission ("Commission") and the following Commission members: Governor of Ohio Mike DeWine ("DeWine"), Ohio Secretary of State Frank LaRose ("LaRose"), Speaker of the Ohio House of Representatives Bob Cupp ("Cupp"), President of the Ohio State Senate Matt Huffman ("Huffman"), and Auditor Keith

Faber ("Faber") (collectively the "Individual Defendants") in their individual and official

capacities.  (ECF Doc. 1, pp. 13-14, ¶¶ 30-35.)[1]

## II.    Background

Plaintiffs filed their Complaint on April 15, 2022, challenging Ohio's March 2, 2022

Congressional redistricting plan ("March 2 Plan"), which was adopted as part of reconfiguring

Ohio's Congressional districts following the 2020 census.  (ECF Doc. 1.)  They argue the March

2 Plan violates the federal Voting Rights Act of 1965 ("VRA") and the Fourteenth and Fifteenth

Amendments to the United States Constitution because it was created without consideration of

racial demographic information.[2]  (Id. at pp. 3-5, ¶¶ 1-6.)  Plaintiffs assert that "Defendants'

racial discrimination and failure to follow federal law, specifically harmed Plaintiffs' class in

Mahoning and Trumbull County, but also diluted Black voting power across Ohio."  (Id. at p. 7,

¶ 15.)  They contend that Defendants acted in direct contradiction of the VRA when they "gave

specific instructions to their staff responsible for the drawing of district maps, to disregard race,

racial bloc voting or any other racial consideration in connection with district configuration."

(Id. at pp. 7-8, ¶ 16.)  They seek "to invalidate the March 2 Plan and enjoin certification of the

results of any election utilizing this Plan for election of representatives for the proposed 6th

Congressional District," arguing that "the process utilized by Defendants to develop their Plans

---

[1] Plaintiffs also assert that that they have sued "Defendant Yost . . . for the reason Plaintiffs challenge the Constitutionality of any legislation enacted to approve any current or proposed redistricting plan[.]"  (ECF Doc. 1, p. 14, ¶ 37.)  However, there is no indication that a summons was filed or issued to Defendant Yost.

[2] The undersigned observes that the March 2 Plan was the subject of ongoing litigation pending in the Supreme Court of Ohio.  See Meryl Neiman, et al. v. Secretary of State Frank LaRose, et al., Case Nos. 2022-0298 and 2022-0303. On July 19, 2022, the Supreme Court of Ohio declared the March 2 Plan invalid, finding it did not comply with Article XIX, Section 1(C)(3)(a) of the Ohio Constitution.  The United States Supreme Court on June 30, 2023 granted the petition for writ of certiorari filed by petitioners Matt Huffman, President of the Ohio Senate, et al. and vacated the Supreme Court of Ohio's judgment and remanded the matter to the Supreme Court of Ohio for further consideration in light of Moore v. Harper, 143 S.Ct. 2065 (2023). Petitioners in Neiman subsequently filed an application for dismissal on September 5, 2023, which the Supreme Court of Ohio granted on September 7, 2023. See https://www.supremecourt.ohio.gov/Clerk/ecms/#/caseinfo/2022/0298 (last visited September 11, 2023).

violates the Voting Rights Act and ignores the historical findings of official racial discrimination

in Ezell Armour, et al. v. The State of Ohio, Case No. 775 F. Supp 1[0]44 (N.D. Ohio 1991)."

(*Id*. at p. 5, ¶6.)

### III.    Claims for Relief

Plaintiffs assert the following four claims for relief in their Complaint:

**First Claim for Relief**: Violation of Section of the Voting Rights Act, 52 U.S.C. § 10301.

**Second Claim for Relief**: Fourteenth Amendment U.S. Const. amend., XIV, § 2; 42 U.S.C. § 1983 (Intentional Racial Discrimination).

**Third Claim for Relief**: Fifteenth Amendment U.S. Const. amend., XV; 42 U.S.C. § 1983 (Intentional Racial Discrimination in Voting).

**Fourth Claim for Relief**:  First and Fourteenth Amendments U.S. Const. amends. I, XIV; 42 U.S.C. § 1983 (Undue Burden on the Right to Vote).

(ECF Doc. 1, pp. 21-25, ¶¶ 60-82.)

### IV.    Summary of Individual Defendants' Motion to Dismiss (ECF Doc. 15)

The Individual Defendants seek dismissal of the Complaint against them pursuant to

Federal Rule of Civil Procedure 12(b)(6).  (ECF Doc. 15.)   They argue that: Plaintiffs' first

claim for relief fails because Plaintiffs cannot establish the requisite preconditions for a § 2 VRA

claim (*id*. at pp. 11, 21-25); Plaintiffs' second claim for relief fails because Plaintiffs have set

forth no set of facts that would establish a claim under § 2 of the Fourteenth Amendment (*id*. at

pp. 11-12, 25-26); Plaintiffs' third claim for relief fails because a vote-dilution claim is not

cognizable under the Fifteenth Amendment (*id*. at pp. 12, 26-28); and Plaintiffs' fourth claim for

relief fails because the First Amendment does not regulate redistricting and partisan

gerrymandering does not abridge First Amendment rights (*id*. at pp. 12, 27-28).  Plaintiffs filed

an opposition to the Individual Defendants' motion to dismiss (ECF Doc. 20) and the Individual

Defendants filed a reply (ECF Doc. 23).

## V.    Summary of Commission's Motion to Dismiss (ECF Doc. 18)

The Commission ("Commission") seeks dismissal of the Complaint against the

Commission in its entirety for the reasons set forth in the Individual Defendants' motion.  (ECF

Doc. 18.)  Alternately, the Commission seeks partial dismissal of the Complaint – specifically

the Second, Third, and Fourth claims for relief – pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6) because (1) "the Commission is not a 'person' under § 1983 and . . .

Plaintiffs cannot [therefore] pursue § 1983 claims against the Commission itself"; and (2) the

"claims are barred against the Commission itself by the Eleventh Amendment and principles of

state sovereign immunity."  (*Id*. at p. 2.)  Plaintiffs respond that they "have no objection to

dismissing all claims against the Ohio Redistricting Commission (hereinafter "ORC") except

[their] claim under §2 of the Voting Rights Act, 52 U.S.C. §10301, et seq."[3]  (ECF Doc. 21, p.

1.)  Although they "do not concede that their Constitutional claims are not cognizable," Plaintiffs

explain that the focus of their action "is Defendants' violation of the Voting Rights Act because

of the express policy to not consider racial demographics in connection with the configuration of

Ohio's proposed United States Congressional districts."  (*Id*.)

## VI.    Standard of Review

Under Rule 12(b)(6), the Court may dismiss a claim when a party fails to plead facts on

which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[3] Considering Plaintiff's consent to the dismissal of its Second, Third, and Fourth claims for relief against the Commission, the Commission's legal arguments in favor of dismissal of those claims is not addressed herein.  If the Court does not dismiss those claims for the reasons discussed below, the undersigned recommends that the Court dismiss Plaintiffs' Second, Third, and Fourth claims for relief against the Commission based on Plaintiffs' consent.

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The plaintiff is not required to include "detailed factual allegations," but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citation omitted). This Court "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018) (citation omitted).

"When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Whittiker v. Deutsche Bank Nat. Tr. Co.*, 605 F. Supp. 2d 914, 924 (N.D. Ohio 2009) ("In ruling on a motion to dismiss or motion for judgment on the pleadings, the Court may . . . consider documents attached to, incorporated by, or referred to in the pleadings.")  "[A]lthough a court must generally accept all well-pled facts as true, if a document referenced in the complaint . . . contradicts the factual allegations in the complaint, the document 'trumps the allegations.'" *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 664 (E.D. Mich. 2022) (citing *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)).  "For a document to contradict the complaint, it must 'utterly discredit' the allegations." *In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020) (citing *Cagayat v. United Collection Bureau, Inc.*, 952 F.3d 749, 755 (6th Cir. 2020), quoting *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386–87 (6th Cir. 2017))).

## VII.    Discussion

**A.    Violation of § 2 of Voting Rights Act Claim**

In their first claim for relief, Plaintiffs allege that Defendants violated § 2 of the Voting

Rights Act, 52 U.S.C. § 10301, *et seq*.  (ECF Doc. 1, pp. 21-22, ¶¶ 60-66.)

**1.    Legal Framework for § 2 VRA Claims**

Section 2 of the VRA provides that:

> No voting qualification or prerequisite to voting or standard, practice, or procedure
> shall be imposed or applied by any State or political subdivision in a manner which
> results in a denial or abridgement of the right of any citizen of the United States to
> vote on account of race or color . . .

52 U.S.C. § 10301(a).  Section 2 provides further that:

> A violation of subsection (a) is established if, based on the totality of circumstances,
> it is shown that the political processes leading to nomination or election in the State
> or political subdivision are not equally open to participation by members of a class
> of citizens protected by subsection (a) in that its members have less opportunity
> than other members of the electorate to participate in the political process and to
> elect representatives of their choice. The extent to which members of a protected
> class have been elected to office in the State or political subdivision is one
> circumstance which may be considered: *Provided,* That nothing in this section
> establishes a right to have members of a protected class elected in numbers equal
> to their proportion in the population.

52 U.S.C. § 10301(b) (emphasis in original).  In response to the Supreme Court's holding in *City

of Mobile v. Bolden*, 446 U.S. 55 (1980), "that there was no violation of either the Fifteenth

Amendment or § 2 of the Voting Rights Act absent proof of intentional discrimination,"

Congress amended § 2 of the VRA to make clear that "proof of intent [was] no longer required to

prove a § 2 violation."  *Chisom v. Roemer*, 501 U.S. 380, 393 (1991); *Nemes v. Bensinger*, 467

F. Supp. 3d 509, 529 (W.D. Ky. 2020) (explaining that "Congress amended the Voting Rights

Act to make clear that intentional discrimination was not a prerequisite for a claim brought under

the statute") (citing *Ohio Democratic Party v. Husted*, 834 F.3d 620, 637 (6th Cir. 2016)).  The

1982 amendment enabled plaintiffs to "prevail under § 2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race." *Chisom*, 501 U.S. at 394.

The Supreme Court faced a § 2 challenge to use of multimember districts under the amended VRA in *Thornburg v. Gingles*, 478 U.S. 30 (1986). The *Gingles* court explained "'[t]he essence of a § 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters.'" *Allen v. Millligan*, 143 S.Ct. 1487, 1503 (2023) (quoting *Gingles*, 478 U.S. at 47). This "occurs where an 'electoral structure operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates.'" *Id.* (quoting *Gingles*, 478 U.S. at 48). The risk of such an occurrence "is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Id.* (bracket in original).

*Gingles* established a framework for evaluating claims under § 2 of the VRA, requiring plaintiffs to "satisfy three 'preconditions'" to "succeed in proving a § 2 violation." *Allen*, 143 S.Ct. at 1502–03 (quoting *Gingles*, 478 U.S. at 50). The first precondition is that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. The proposed district must be a "reasonably configured district," meaning that "it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Allen*, 143 S.Ct. at 1503 (quoting *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S.Ct. 1245 at 1248 (2022) (per curiam); citing *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015)). "The reason that a minority group . . . must show, as a threshold matter, that it is sufficiently

large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 51, n. 17 (emphasis in original).

The second precondition is that "the minority group must be able to show that it is politically cohesive." *Id.* at 50. The third precondition is that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, . . . usually to defeat the minority's preferred candidate." *Id.* If all three preconditions are satisfied, a plaintiff must "show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Allen*, 143 S.Ct. at 1503 (citing and quoting *Gingles*, 478 U.S. at 45–56). "[O]nly when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett v. Strickland*, 556 U.S. 1, 11–12 (2009) (plurality).

### 2. Whether Plaintiffs Stated a Viable § 2 VRA Claim

Defendants assert that Plaintiffs have failed to state a claim under § 2 of the VRA because they cannot satisfy the first *Gingles* precondition – that "the minority group . . . be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," 478 U.S. at 50 – and likewise cannot meet the *Gingles* totality of circumstances test. (ECF Doc. 15, pp. 21-25; ECF Doc. 23, pp. 5-7.) In support, they note that Exhibit D to the Complaint "shows that the African American population in the proposed district is 284,938, while the White population in the proposed district is 333,776," thus demonstrating

that "the African American population in the proposed district *does not* constitute a majority." (ECF Doc. 15, pp. 22-23 (citing ECF Doc. 1-5, p. 2) (emphasis in original).)

Plaintiffs respond that the *Gingles* preconditions do not apply here because Plaintiffs are not asserting an "'election' claim in a jurisdiction with a majority vote requirement," but rather a "nomination" claim like the claim they assert was recognized in *Armour v. Ohio*, 775 F.Supp. 1044 (N.D. Ohio 1991).  (ECF Doc. 20, p. 5.)  Plaintiffs concede that the district they propose "would have a Black population of 284,938 and White population of 333,776," but argue that "[t]he number of Black geographically compact [voters] in the Youngstown-Warren area is sufficient to *nominate* a candidate of choice."  (*Id.* at pp. 7-8 (emphasis added).)  They contend "[t]here is no authority for the proposition that a nomination claim filed in a jurisdiction without a majority vote requirement must meet the <u>Gingles</u> precondition."  (*Id.* at p. 7.)  Alternately, they argue that their proposed district "*suggests* a district where Black voters would satisfy the first *Gingles* precondition."  (*Id.* at pp. 7, 17 (emphasis added).)

Whether Plaintiffs have sufficiently stated a § 2 VRA claim is dependent upon the answer to two questions embedded in the parties' arguments.  First, whether the *Gingles* preconditions apply to Plaintiffs' § 2 VRA claim.  Second, if the *Gingles* preconditions apply, whether Plaintiffs can satisfy the first precondition.  The undersigned turns to these questions below.

### i.    Whether *Gingles* Preconditions Apply to Plaintiffs Claim

Plaintiffs argue that the *Gingles* preconditions do not apply to their § 2 VRA claim because they are asserting a "nomination" claim, like that in *Armour*, 775 F. Supp. 1044.  (ECF Doc. 20, pp. 3-7.)  They argue *Gingles* "made it clear that the criteria announced were not to be applied universally," and that "[t]here is no authority for the proposition that a nomination claim filed in a jurisdiction without a majority vote requirement must meet the <u>Gingles</u> precondition."

(*Id*. at p. 7 (quoting *Gingles*, footnote 12).)  For the reasons set forth below, the undersigned finds the *Gingles* preconditions do apply to Plaintiffs § 2 VRA claim.

In *Armour*, a three-judge panel in the Northern District of Ohio considered a "challenge to the constitutionality of the apportionment of the Ohio House of Representatives."  775 F. Supp. at 1046.  The plaintiffs had alleged "that the boundary between House Districts 52 and 53 in Mahoning County deliberately and effectively dilute[d] the minority vote, and therefore violate[d] the Fifteenth Amendment and the Voting Rights Act of 1965."  *Id.*  As in this case, the defendants in *Armour* argued there was no need to reach the totality of the circumstances test because "the plaintiffs d[id] not have a large enough population to constitute a majority in a single-member district, however drawn," and thus could not meet the first *Gingles* precondition. 775 F.Supp. at 1050.  The *Armour* court did not agree with that argument.

In explanation, the *Armour* panel noted that *Gingles* addressed a challenge to a multi-member district, not a single member district, and had "expressly limited the application of [its] pre-conditions to situations in which plaintiffs were challenging *only* the multi-member districting."  775 F.Supp. at 1051 (emphasis in original) (citing *Gingles*, 478 U.S. at 46 n. 12). The panel also observed that *Gingles* specified that the court had "'no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections.'"  *Id.* (emphasis in original) (quoting *Gingles*, 478 U.S. at 46 n. 12).  In considering whether an "influence" claim was cognizable, the *Armour* panel noted that the Supreme Court in

11

*Chisom* had "suggested that a dilution of minority influence may be sufficient to sustain a Section 2 results claim." *Id.* (citing 501 U.S. 380).  The panel thus held:

> Based on . . . statements in *Chisom* and the Court's express disclaimers regarding the scope of its decision in *Gingles*, we cannot conclude that the Court intended the *Gingles* pre-conditions for challenges to multi-member districting schemes to apply to all Section 2 challenges. [] Therefore, we do not adopt them for the racial gerrymandering claim at issue here.

*Id*. at 1502 (footnote omitted).  Thus, the court did not apply the *Gingles* preconditions and proceeded to a totality of the circumstances analysis.  *Id*. at 1501–02.

Since the three-judge-panel decision in *Armour*, there has been substantial development of federal caselaw interpreting and applying § 2 of the VRA.  For example, although the *Gingles* preconditions were established in the context of a challenge to a multi-member district, the Supreme Court has since "applied § 2 to States' districting maps in an unbroken line of decisions stretching four decades" and "unanimously held § 2 and *Gingles* '[c]ertainly ... apply' to claims challenging single-member districts."  *Allen*, 143 S.Ct. at 1515 (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993) (bracket in original)); *see also id.* at 1516 (noting the "statutory text . . . supports the conclusion that § 2 applies to single-member districts").

Numerous courts have also considered whether § 2 and the *Gingles* framework apply to "'influence' districts – districts in which black voters would not constitute a majority but in which they could, with the help of a predictable number of cross-over votes from white voters, elect their candidates of choice."  *Voinovich v. Quilter*, 507 U.S. 146, 150 (1993).  On several occasions, the Supreme Court observed that it was an open question whether a § 2 vote dilution challenge could require the creation or protection of an "influence" district, and if so whether the *Gingles* preconditions would apply.  The *Gingles* court explicitly did not decide the issue.  478 U.S. at 46 n. 12.  The Supreme Court again declined to decide the question in *Voinovich*.  507 U.S. at 154.  The *Voinovich* court did recognize that the first *Gingles* precondition "would have

12

to be modified or eliminated when analyzing [an] influence-dilution claim," which the court assumed *arguendo* to be actionable, explaining:

> The complaint in such a case is not that black voters have been deprived of the ability to constitute a *majority*, but of the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority.

*Voinovich*, 507 U.S. at 158 (emphasis in original).  The court ultimately did not have to decide whether such claims were cognizable and/or what other framework might apply because it found the appellee had failed to demonstrate that the third *Gingles* precondition was met.  *Id.* at 158.

In *Cousin v. Sundquist*, the Sixth Circuit reversed a district court's finding of liability for an "influence" vote dilution claim under § 2.  145 F.3d 818 (1998).  The court held that the district court had erred in finding the plaintiffs met the third *Gingles* precondition and in its application of the totality of the circumstances test.  *Cousin*, 145 F.3d at 821-22, 826, 834.  With respect to the first *Gingles* precondition, the *Cousin* court noted that the case involved an influence claim that was "based on the premise that the Section 2 violation in this case consists of an impairment of the minority's ability to *influence* the outcome of the election, rather than to *determine* it."  *Id.* at 828.  Noting that the Supreme Court had not yet decided whether influence claims were permitted under § 2, the *Cousin* court nevertheless stated that it "would reverse any decision to allow such a claim to proceed since [the court did] not feel that an 'influence' claim is permitted under the Voting Rights Act."  *Id.* at 828-29.

Although the *Cousin* court's statements regarding influence claims and the first *Gingles* precondition may be dicta, district courts have since relied on *Cousin* to find that influence claims are not cognizable under § 2 of the VRA in the Sixth Circuit.  *See, e.g., O'Lear v. Miller*, 222 F.Supp.2d 850, 861 (E.D. Mich. 2002); *Parker v. Ohio*, 263 F.Supp.2d 1100, 1105 (S.D. Ohio 2003).  The majority of a three-judge panel in *Parker* found a vote dilution claim under § 2

13

must fail because the plaintiffs sought influence districts – where the minority group could not

"form a majority, but [was] sufficiently large and cohesive to effectively influence elections" –

because "influence claims are not cognizable in our circuit and the plaintiffs have failed to

establish the first *Gingles* precondition." *Parker*, 263 F.Supp.2d at 1104-05.  But one concurring

judge instead found the plaintiffs had failed to meet the third *Gingles* precondition, explaining

that the *Cousin* court's discussion of the first *Gingles* precondition was "obviously dicta."

*Parker* 263 F.Supp.2d at 1109, 1112 (concurrence).  The Supreme Court summarily affirmed the

*Parker* decision, *Parker v. Ohio*, 540 U.S. 1013 (2003), and at least one court has held that the

summary affirmance effectively forecloses any recognition of influence dilution claims under § 2

of the VRA.  *See Arizona Minority Coalition for Fair Redistricting v. Arizona Independent

Redistricting Commission*, 366 F.Supp.2d 887, 907 (D. Ariz. 2005).

In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Supreme Court took up the question

whether § 2 of the VRA "can be invoked to require state officials to draw election-district lines

to allow a racial minority to join with other voters to elect the minority's candidate of choice,

even where the racial minority is less than 50 percent of the voting-age population in the district

to be drawn." *Id.* at 6 (plurality).  The Supreme Court of North Carolina had held that "'a

minority group must constitute a numerical majority of the voting population in the area under

consideration before Section 2 . . . requires the creation of a legislative district to prevent dilution

of the votes of that minority group.'" *Bartlett*, 556 U.S. at 9 (citation omitted).  The Supreme

Court affirmed the North Carolina Supreme Court's decision.  *See id.* at 9, 26.

The plurality in *Bartlett* applied *Gingles* to find "that a party asserting § 2 liability must

show by a preponderance of the evidence that the minority population in the potential election

district is greater than 50 percent." *Id.* at 19-20 (plurality).  Specifically, it held: "Only when a

14

geographically compact group of minority voters could form a majority in a single-member district has the first *Gingles* requirement been met." *Id.* at 26.  The concurring opinion concurred in the judgement only, arguing that § 2 of the VRA does not authorize any vote dilution claims, and that the *Gingles* framework therefore should not be applied.  *Id.* at 26 (concurrence).  But the Supreme Court's recent decision in *Allen* affirms that vote dilution claims remain cognizable under § 2, and that the *Gingles* framework continues to apply.  *Allen*, 143 S.Ct. at 1502-07.

Turning back to the *Armour* decision relied upon by Plaintiffs, it is clear that subsequent caselaw requires a different result.  The *Armour* panel declined to consider the *Gingles* preconditions in part because *Gingles* had not been applied to single-member redistricting challenges, but it is now well-established that the *Gingles* framework applies in such cases. *Compare Armour*, 775 F.Supp. at 1051-52 *with Allen*, 143 S.Ct. at 1515.  The *Armour* panel also declined to consider the *Gingles* preconditions in light of precedent suggesting that a § 2 claim for dilution of minority influence might be cognizable, but subsequent precedent makes it clear that "influence" claims are not cognizable and the entire *Gingles* framework must be applied. *Compare Armour*, 775 F.Supp. at 1051-52 (citing *Chisom*, 501 U.S. 380) *with Allen*, 143 S.Ct. at 1502-07; *Bartlett*, 556 U.S. at 9, 26; *Cousin*, 145 F.3d at at 828-29; *Parker*, 263 F.Supp.2d at 1104-05, *aff'd.* 540 U.S. 1013.

Plaintiffs' argument that they are stating a "nomination" rather than "influence" claim – where "[t]he number of Black [voters] geographically compact in the Youngstown-Warren area is sufficient to nominate a candidate of choice" – does not change the analysis.  (ECF Doc. 20, p. 8.)  The court in *Armour* clearly explained that the voter dilution claim at issue related to the ability of the minority group to influence the outcome of elections by combining its votes with those of a reliable number of cross-over voters, explaining:

15

> In a reconfigured district, plaintiffs will constitute nearly one-third of the voting age population and about half of the usual Democratic vote.  Therefore, the Democratic Party and its candidates will be forced to be sensitive to the minority population by virtue of that population's size. . . .  Since black voters consistently vote eighty to ninety per cent Democratic, we find that plaintiffs could elect a candidate of their choice, although not necessarily of their race, in a reconfigured district.

775 F.Supp. at 1059-60.  That is precisely the type of "influence" claim that was rejected by the Supreme Court in *Bartlett* and the Sixth Circuit in *Cousin*.  *See* 556 U.S. at 6; 145 F.3d at 828.  The *Armour* court did not articulate its findings based on a "nomination claim" as described by Plaintiffs, and no authority has been presented to this Court to suggest that such a claim would be exempt from the *Gingles* preconditions applied in all § 2 vote dilution cases.

The Supreme Court in *Allen* "declin[ed] to adopt an interpretation of § 2 that would 'revise and reformulate the *Gingles* threshold inquiry that has been the baseline of . . . § 2 jurisprudence' for nearly forty years."  *Allen*, 143 S.Ct. at 1508 (quoting *Bartlett*, 556 U.S. at 16).  It explained that it had "applied *Gingles* in one § 2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country."  *Id.* at 1504 (internal citations omitted).  Given the Supreme Court's recent decision not to alter the *Gingles* framework for § 2 VRA claims and the absence of clear legal authority to treat Plaintiffs' § 2 VRA claim different from other § 2 VRA claims, the undersigned finds the *Gingles* preconditions are applicable to Plaintiffs' First Claim for Relief.

### ii.    Whether Plaintiffs Can Satisfy the *Gingles* Preconditions

Having concluded that *Gingles* preconditions apply to Plaintiffs' vote dilution claim, the undersigned turns to whether Plaintiffs have stated a claim for relief under § 2 of the VRA.

Defendants argue that Plaintiffs cannot satisfy the first *Gingles* precondition because they "do not plausibly allege in their Complaint that their minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district.'" (ECF Doc. 15, pp.

16

21-25; ECF Doc. 23, pp. 5-7.)  Specifically, they argue that Exhibit D to the Complaint shows the black population in Plaintiffs' proposed district is 284,938, while the white population is 333,776; these numbers are contrary to Plaintiffs' allegation that they "presented a proposed district to Defendants that included areas North and Northwest of Mahoning and Trumbull counties and would constitute a district with a *black voting majority*." (ECF Doc. 15, pp. 22-23 (citing ECF Doc. 1, p. 17, ¶ 47 (emphasis added); ECF Doc. 1-5 ("Ex. D")).)

The numbers in Exhibit D establish that the black population in Plaintiffs' proposed district would constitute only 46% of the total population of Plaintiffs' proposed district, less than a majority.  Therefore, the undersigned must accept as true the fact that black voters would constitute less than a majority in the proposed district.  *See Amir*, 606 F. Supp. 3d at 664 (finding while "a court must generally accept all well-pled facts as true, if a document referenced in the complaint . . . contradicts the factual allegations in the complaint, the document 'trumps the allegations'"); *see also Bassett*, 528 F.3d at 430 (allowing consideration of documents attached to pleadings when ruling on a motion to dismiss).

Plaintiffs do not dispute the population numbers set forth in Exhibit D.[4]  (ECF Doc. 20, p. 17.)  Instead, they acknowledge that the minority group in their proposed district would not constitute a majority, but argue that their proposed district nevertheless "*suggests* a district where Black voters would satisfy the first *Gingles* precondition."  (ECF Doc. 20, p. 17 (emphasis added).)  More specifically, they argue "[w]hen this total voting block is further divided by political party, which would be required in a *Gingles* threshold condition analysis, the Simon

---

[4] In their opposition brief, Plaintiffs refer to Exhibit D as "Exhibit F" and describe the total voting aged black population in the proposed district as 284,338, rather than 284,938.  (*Compare* ECF Doc. 20, p. 17 *with* ECF Doc. 1-5.)  The undersigned concludes these references are typographical errors, since Plaintiffs do not explicitly challenge or contest the information set forth in Exhibit D to the Complaint.  Certainly, there is no material dispute as to the fact that the total voting aged black population in the proposed district makes up less than 50% of the district.

Parties class would be sufficiently large and geographically compact to prevail in a single member election."  (*Id.*)

Plaintiffs provide no legal authority for their contention that application of the first *Gingles* precondition requires *both* a division between minority and majority populations *and* a second division of those same populations based on political party affiliation.  As discussed in Section VII.A.2.i., *supra*, the Supreme Court has upheld the application of the entire *Gingles* framework in the context of vote dilution claims under § 2 of the VRA.  *See Allen*, 143 S.Ct. at 1502-06.  This includes the first *Gingles* precondition, that "the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Id.* at 1503 (citations omitted) (brackets in original).

Because there is no question that the minority group in Plaintiffs' proposed district would *not* be sufficiently large and geographically compact to constitute a *majority* in a reasonably configured district, the undersigned finds Plaintiffs' have not plausibly alleged facts sufficient to satisfy the first *Gingles* precondition, and therefore have failed to allege a plausible § 2 VRA claim in their First Claim for Relief.  The undersigned accordingly recommends that the Court dismiss Plaintiffs' First Claim for Relief.

## B.    Fourteenth Amendment Intentional Racial Discrimination Claim

In their second claim for relief, Plaintiffs allege that Defendants intentionally discriminated based on race in violation of § 2 of the Fourteenth Amendment of the United States Constitution.  (ECF Doc. 1, pp. 22-24, ¶¶ 67-72.)

### 1.    Section 2 of the Fourteenth Amendment

Section 2 of the Fourteenth Amendment states:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding

Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2.

### 2.    Whether Plaintiffs Stated a Viable § 2 Fourteenth Amendment Claim

In their Second Claim for Relief, Plaintiffs allege that "[t]he March 2 Plan violates Section 2 of the Fourteenth Amendment to the United States Constitution because the Plan abridges the rights of Black Ohioans to vote because the Plan was devised without consideration of the circumstances applicable to Black voters."  (ECF Doc. 1, p. 23, ¶ 71.)

Defendants argue that Plaintiffs' Fourteenth Amendment claim should be dismissed because "Plaintiffs' claim that Defendants committed intentional racial discrimination in violation of § 2 of the Fourteenth Amendment is both legally and factually deficient."  (ECF Doc. 15, p. 25.)  They explain:

Plaintiffs simply fail in all respects to state a claim. They can offer no legal authority that Section 2 of the Fourteenth Amendment enjoys any legal relevance to their vote dilution claim as set forth in their Complaint, or that the facts alleged in their Complaint even make out a viable claim under that provision of the U.S. Constitution.

(*Id*. at p. 26.)  Alternately, Defendants argue "even if Plaintiffs could establish that Section 2 of the Fourteenth Amendment is a viable legal claim, Plaintiffs still fail to allege facts sufficient to

19

establish intentional racial discrimination" and "can offer no legal support for the notion that the *lack* of racial consideration amounts to *intentional* discrimination."  (*Id*. (emphasis in original).)

The Supreme Court has held that "multimember districts violate the Fourteenth Amendment if 'conceived or operated as purposeful devices to further racial discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (citations omitted).  Such cases are "subject to the standard of proof generally applicable to Equal Protection Clause cases." *Id.* (citations omitted).  Under that standard, a violation "is established only where there is proof of a racially discriminatory intent or purpose." *Wesley v. Collins*, 791 F.2d 1255, 1262 (6th Cir. 1986) (citing *Village of Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 265 (1977)).  To establish a racial discriminatory intent or purpose, "[t]he challenged legislation must have been pursued at least in part because of, not merely in spite of, its adverse effects upon an identifiable [racial] group." *Wesley*, 791 F.2d at 1262 (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)) (internal quotation marks omitted).  "Challengers need to show only that discriminatory purpose was 'a motivating factor,' not necessarily the law's 'dominant' or 'primary' purpose." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 265–66).

Here, Plaintiffs explain that their "argument under the 14th Amendment is simply that under §2 of that Amendment, Ohio should be penalized for its intentional disregard of the number of Black voters in the state."  (ECF Doc. 20, p. 32 (citing *Saunders v. Wilkins*, 152 F.2d 235 (4th Cir. 1945)).)  They argue that Defendants' "intentional disregard" of the number of black voters and lack of "consideration of the circumstances applicable to" black voters are sufficient to demonstrate intentional racial discrimination in violation of the Fourteenth

Amendment.  (ECF Doc. 1, p. 23, ¶ 71; ECF Doc. 20, p. 32.)  The only specific allegations they offer in support of a discriminatory intent are that Ohio has a history of racial discrimination in voting, that there are reasonably foreseeable discriminatory impacts of implementing the plan, and that the justifications offered for the plan are "tenuous and pretextual."  (ECF Doc. 1, p. 24, ¶ 72.)  The allegations of the Complaint also reflect that Defendants reported they "did not use demographic data or racial data" in the production of their maps.  (ECF Doc. 1, p. 8, ¶ 17.)

The undersigned finds Plaintiffs have failed to state a claim for relief under § 2 of the Fourteenth Amendment.  First, they have failed to identify authority to show that a vote dilution claim regarding single member influence districts is cognizable under § 2 of the Fourteenth Amendment.  *Compare Rogers*, 458 U.S. at 617 (finding vote dilution claims available for *multimember* districts in specified circumstances).  Plaintiffs have also failed to plead sufficient facts to plausibly show that Defendants acted with a discriminatory purpose.  *See Iqbal*, 556 U.S. at 676-81 (finding the plaintiff "must plead sufficient factual matter to show" that actions were taken "for the purpose of discriminating," and further finding that specified allegations did "not plausibly establish" a discriminatory purpose).  Plaintiffs specifically allege that Defendants did *not* consider racial or demographic data in preparing the relevant maps, in violation of the Voting Rights Act.  (*See* ECF Doc. 1, p. 8, ¶ 17.)  Plaintiffs' conclusory allegations that the justifications for the plan are "tenuous and pretextual" and that Defendants failed to consider the circumstances of black voters are insufficient to plausibly allege that a discriminatory purpose was a "motivating factor" in Defendants' actions or decisions.

Plaintiffs' citation to an out-of-circuit case from 1945 does not alter this analysis.  In *Saunders*, the appellant argued under § 2 of the Fourteenth Amendment that a poll tax law abridged the rights of U.S. citizens to vote.  152 F.2d at 237.  The Fourth Circuit found the claim

presented a question that was political in nature, and was therefore not justiciable.  *Id.* at 237-38.

Plaintiffs do not explain how *Saunders* supports their claim for relief under § 2 of the Fourteenth

Amendment, and no such support is evident.

For the reasons stated above, the undersigned finds Plaintiffs have failed to allege a

plausible claim for intentional discrimination under § 2 of the Fourteenth Amendment and

therefore recommends that the Court dismiss Plaintiffs' Second Claim for Relief.

**C.**   **Fifteenth Amendment Intentional Racial Discrimination in Voting Claim**

In their third claim for relief, Plaintiffs allege that Defendants intentionally discriminated

based on race in violation of the Fifteenth Amendment of the United States Constitution.  (ECF

Doc. 1, pp. 24-25, ¶¶ 73-76.)

**1.**    **Fifteenth Amendment**

Section 1 of the Fifteenth Amendment states:

> The right of citizens of the United States to vote shall not be denied or abridged by the
> United States or by any State on account of race, color, or previous condition of
> servitude.

U.S. Const. amend. XV, § 1.

**2.**    **Whether Plaintiffs Stated a Viable Fifteenth Amendment Claim**

Plaintiffs allege that the March 2 Plan "violates the Fifteenth Amendment to the United

States Constitution because Defendants intentionally proposed, enacted and intend to administer

and enforce this plan and election procedures to deny and abridge the right to vote on account of

race or color."  (ECF Doc. 1, pp. 24-25, ¶ 76.)

Defendants assert that Plaintiffs' Fifteenth Amendment vote-dilution claim is foreclosed

by precedent.  (ECF Doc. 15, pp. 26-27; ECF Doc. 23, p. 8.)  They correctly observe that the

Supreme Court has not "held any legislative apportionment inconsistent with the Fifteenth

Amendment," *Voinovich*, 507 U.S. at 159, and has not "held that vote dilution violates the Fifteenth Amendment," *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334, n. 3 (2000). Plaintiffs provide no legal authority in response to Defendants' argument that a vote-dilution claim under the Fifteenth Amendment is not cognizable and the undersigned finds no basis "to step beyond the bounds of clearly delineated precedent into the sphere of speculation." *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 748 (W.D. Tenn. 2012) (granting motion to dismiss Fifteenth Amendment vote dilution claim).

Further, even if a Fifteenth Amendment claim were cognizable, Plaintiffs would "need to show that the redistricting and reapportionment plan was intentionally discriminatory toward African–Americans." *Parker*, 263 F. Supp. 2d at 1106–07 (citing *Voinivich*, 507 U.S. at 159). Plaintiffs allege that the March 2 Plan violates the Fifteenth Amendment "because Defendants intentionally proposed, enacted and intend to administer and enforce this plan and election procedures to deny and abridge the right to vote on account of race or color." (ECF Doc. 1, pp. 24-25, ¶ 76.) As discussed in Section VII.B.2., *supra*, the Complaint also alleges that Defendants reported they "did not use demographic data or racial data" in the production of their maps. (*Id.* at p. 8, ¶ 17.) Upon a review of the Complaint, the undersigned finds Plaintiffs' conclusory allegations regarding Defendants' intent are insufficient to plausibly show that the March 2 Plan was the result of a discriminatory purpose.

For the reasons stated above, the undersigned finds Plaintiffs have failed to allege a plausible claim for intentional discrimination under the Fifteenth Amendment and therefore recommends that the Court dismiss Plaintiffs' Third Claim for Relief.

**D.      First and Fourteenth Amendment Undue Burden on Right to Vote Claim**

In their fourth claim for relief, Plaintiffs allege that Defendants violated the First and Fourteenth Amendments by adopting redistricting procedures that deny them the opportunity to elect representatives of their choice.  (ECF Doc. 1, p. 25, ¶¶ 77-80.)

Defendants argue Plaintiffs cannot state a claim for relief under the First Amendment because "the First Amendment does not regulate redistricting," (ECF Doc. 15, p. 27), and because any partisan gerrymandering claim under the First Amendment is a "nonjusticiable political question[]" that "federal courts lack jurisdiction to entertain," (*id*. at pp. 27-28 (citing *Rucho v. Common Cause*, 139 S.Ct. 2484, 2508 (2019))).

In *Rucho*, the Supreme Court reviewed two district court decisions that found claims for partisan gerrymandering justiciable under the First Amendment and further held that the relevant redistricting plans "violated the plaintiffs' First Amendment right to association."  139 S.Ct. at 2504.  The Supreme Court reversed the decisions, finding "there [we]re no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue" because the plaintiffs remained "free to engage in those activities no matter what the effect of a plan may be on their district."  *Id.*  If the court were to sustain First Amendment claims based on partisan gerrymandering, it argued that "'would render unlawful *all* consideration of political affiliation in districting,' [] contrary to . . . established precedent."  *Id.* at 2505 (emphasis in original) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 294 (2004) (plurality)).  Accordingly, the Supreme Court concluded that partisan gerrymandering claims present political questions that are beyond the reach of the federal courts.  *Id.* at 2508.

Notably, the *Rucho* court distinguished partisan from *racial* gerrymandering claims under the Equal Protection Clause of the Fourteenth Amendment, explaining:

> Unlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails. It asks instead for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship.

*Rucho*, 139 S.Ct. at 2502.  While this distinction excludes racial gerrymandering claims from the finding that partisan gerrymandering claims are non-justiciable political questions, it also emphasizes the lack of authority for any finding that a racial gerrymandering or vote dilution claim may be asserted under the First Amendment.  Plaintiffs have failed to provide any authority to support the existence of any applicable First Amendment claim for relief.

As to any claim Plaintiffs seek to assert under § 1 of the Fourteenth Amendment, the Supreme Court has held that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno*, 509 U.S. 630, 649 (1993).  An equal protection claim is "'analytically distinct' from a vote dilution claim," with its essence being "that the State has used race as a basis for separating voters into districts." *Miller v. Johnson*, 515 U.S. 900, 911 (1995).  In *Miller*, the Supreme Court explained:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not

subordinated to race, a State can "defeat a claim that a district has been gerrymandered on racial lines."

*Miller*, 515 U.S. at 916 (quoting *Shaw*, 509 U.S. at 647).  Thus, the primary question in an equal protection claim under the Fourteenth Amendment is whether "race was the predominant factor" motivating the redistricting decision.  *Id.*

 Here, Plaintiffs allege simply that Defendants "adopted redistricting procedures that result in denial to the [Plaintiffs] of the opportunity to elect representatives of choice" and intentionally failed to comply with the VRA and Fourteenth and Fifteenth Amendments.  (ECF Doc. 1, p. 25, ¶¶ 80, 82.)  Such allegations do not plausibly support a finding that race was the "predominant factor" in the development or implementation of the March 2 Plan.  Indeed, Plaintiffs' allegations that Defendants engaged in a "policy of non consideration of racial demographics in connection with developing the March 2, 2022 Congressional Plan" and adopted "an explicit process policy to disregard racial demographics in connection with district configuration" directly conflict with any finding that race was the "predominant factor" in the alleged Fourteenth Amendment violation.  (ECF Doc. 1, p. 5, ¶ 6.)  The undersigned therefore finds that Plaintiffs' allegations in support of their Fourth Claim for Relief are insufficient to plausibly state a claim for relief under the Equal Protection Clause of the Fourteenth Amendment.

For the above reasons, the undersigned finds Plaintiffs have failed to allege a plausible claim for undue burden on the right to vote under the First or Fourteenth Amendments, and therefore recommends that the Court dismiss Plaintiffs' Fourth Claim for Relief.

## VIII.   Recommendation

For the reasons set forth above, the undersigned recommends that the Court **GRANT** Defendants' motions to dismiss (ECF Doc. 15; ECF Doc. 18) because Plaintiffs have failed to state a claim for relief under § 2 of the Voting Rights Act or under the First, Fourteenth, or Fifteenth Amendments.

September 12, 2023

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).