## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DISTRICT

| | | |
|---|---|---|
| THE HONORABLE REVEREND KENNETH L. SIMON, ET AL | : : | CASE NO.  4:22-cv-612 |
| PLAINTIFFS, | : : : | RELATED CASE NOS. 2:21-CV-2267 AND 4:88-CV-1104 |
| VS. | : : | CIRCUIT JUDGE JOAN L. LARSEN JUDGE SOLOMON OLIVER |
| GOVERNOR MIKE DEWINE, ET AL. | : : | JUDGE JOHN R. ADAMS |
| DEFENDANTS. | : : | "CLASS-ACTION ALLEGATIONS" |
| | : : | "CLAIM OF UNCONSTITUTIONALITY" |

## SIMON PLAINTIFFS' RENEWED  MOTIONS FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PARTIAL SUMMARY JUDGMENT

In accordance with the provisions of Federal Rules of Civil Procedure  56 and 65, and the attached transcripts of testimony, Plaintiffs, the Honorable Kenneth L. Simon, the Honorable Lewis W. Macklin, II and Helen Youngblood, (hereinafter "the Simon Parties"), respectfully move this Honorable Court for an immediate order enjoining Defendants, their agents and successors in office, and all persons acting in concert with them from issuing a certificate of election for representative of the Ohio 6th Congressional District, Exhibit A, in the June 11, 2024 special general election.

An injunction should issue because  the configuration of 6th  Ohio Congressional District is the product of  Defendants' intentional  disregard of  their duty under 52 U.S.C. §10301, et seq. and the Fourteenth Amendment  to consider racial demographics and to consider whether the totality of circumstances applicable to 6th District   resulted in the political  processes  leading  to  nomination  or  election  not  being  equally  open   to participation by Plaintiffs' putative class and whether they have less opportunity to elect

representatives of choice. The 6th Congressional District lines unlawfully dilute the voting strength of plaintiffs' putative class.

Defendants intentionally  ignored the VRA and the 14th Amendment. They also ignored the opinion in <u>Armour v. Ohio</u>., Exhibit B, which documents a history of intentional racial discrimination in redistricting by the State of Ohio  in Plaintiffs' geographic area and evidence of continued  racially polarized voting. The testimony of defendants chief map maker, Mr. DiRossi, at Exhibit C and the comments of President Huffman and Speaker Cupp at Exhibit D and proof that Defendants failed to comply with the VRA and have as a result drawn district maps that dilute the voting strength of Plaintiff's putative class thus violating federal law.

A Memorandum in support of this motion, Proposed Order and Exhibits are attached.

/s/ Percy Squire_____
Percy Squire (0022010)
Percy Squire Co., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
(614) 224-6528, Telephone
(614) 224-6529, Facsimile
psquire@sp-lawfirm.com

## MEMORANDUM

### A.  INTRODUCTION

A three -judge district court was appointed in this case on April 25, 2024. Plaintiff respectfully hereby renew their previously filed Motions for a temporary restraining order, preliminary injunction and for class certification. Plaintiffs specifically request a remedy for Defendants' total disregard of Plaintiffs' rights under the VRA and Fourteenth Amendment. Plaintiffs have been denied appropriate process. Their claims have been trivialized. Plaintiffs through this motion respectfully request consideration to which they were entitled two years ago instead of being forced to participate in an election structure that is racially  discriminatory.

A temporary restraining order should be issued because: (1) Plaintiffs are likely to prevail on the merits in this action; (2) Plaintiffs will suffer irreparable harm during the pendency of this action if this relief is not granted; (3) the balance of equities strongly favor Plaintiffs'; and (4) an injunction is in the public interest. In support of this Motion, Plaintiffs submit (i) a Memorandum in Support of this Motion; and (ii) Exhibits A —F (iii) an Exhibit List describing the exhibits submitted in support of the Motion; and (iv) a Proposed Order. Plaintiffs request oral argument on their motion for temporary restraining order.

### B.  BACKGROUND

Plaintiffs in this action have filed a complaint that alleges the Ohio Redistricting Commission intentionally violated Sections 2 of the Voting Rights Act 52 U.S.C. §10301, et seq in connection with the proposed configuration of  the 6th Ohio Congressional district. Since filing, the challenged district lines have been enacted. A special general election for an unexpired term is scheduled for June 11, 2024. The 6th Congressional District lines dilute Plaintiffs' voting strength by submerging Plaintiffs into a racially polarized voting

block of voters located in several racially polarized voting counties south of Mahoning County and stretching over 165 miles, counties with negligible number of Black voters, while a district proposed by Plaintiffs would contain over 250,000 Blacks voters and enabled Plaintiffs to elect a representative of choice. Exhibit E. Plaintiffs should be accorded a remedy instead of being ignored for another election cycle.

Plaintiffs' motion should be granted as a threshold matter in this action for the reason Defendants have stated publicly that the challenged district was configured without any regard whatsoever to whether the proposed district lines impair Plaintiffs' ability to participate equally in the electoral process and elect representatives of choice. Defendants, despite the clear admonitions of the VRA that no voting…standard practice or procedure shall be imposed in a manner that dilutes Black voting strength and the historical findings of official racial discrimination set forth by this Court in Armour v. Ohio, 775 F. Supp. 1044 (6th Cir. 1991) concerning the role of race in elections in Mahoning County, Ohio, adopted a wholesale policy of ignoring racial demographics in Mahoning County elections[1]. An injunction should be issued for the reason Defendants' conduct here violates the clear instruction of the United States Supreme Court concerning the procedure that should be followed to comply with §2 of the VRA. See, Thornburg v. Gingles, 478 U.S. 30 (1986).

In Thornburg, the United States Supreme Court stated both amended §2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, courts, and implicitly legislative bodies configuring legislature districts, must

---

[1] [R]edistricting legislatures will almost always be aware of racial demographics, but that sort of race consciousness does not lead inevitably to impermissible race discrimination. See, Shaw v. Reno, 509 U.S. 630, 646. Here defendants configured districts without any consideration of racial demographics and therefore drew districts that failed to take into account historical and previous judicial findings of racial block voting..

consider the "totality of the circumstances" and determine, based "upon a searching practical evaluation of the past and present reality,' S. Rep. at 30 (footnote omitted), whether the proposed structure results in the political process being equally open to minority voters. "'This determination is peculiarly dependent upon the facts of each case,'" Rogers, supra, at 621, quoting Nevett v. Sides, 571 F.2d 209, 224 (CA5 1978), and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. 458 U.S. at 458 U. S. 622. The issue underlying this motion is whether Defendants violated §2 and Armour by totally disregarding race when they configured the districts challenged here. The clear answer to this question is yes. Accordingly, judgment should issue enjoining the certification of an election in the challenged districts and granting partial summary judgment in relation to the question of whether Defendants violated the VRA by intentionally ignoring the totality of circumstances and the 15th Amendment by ignoring the VRA intentionally.

### C. DEFENDANTS' POLICY CONCERNING ROLE OF RACE CONTRARY TO LAW

In order to comply with the VRA the redistricting process must take into consideration whether a white "majority votes sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate." Thornburg v. Gingles, 478 U.S. 30, 51 (1986). Here, Plaintiffs provided evidence to Defendants demonstrating that consideration of race was mandatory to account for the racial discrimination historical findings in Armour to prevent "retrogression in respect to Plaintiffs' ability…to elect their preferred candidates of choice.'" See, Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1263 (2015) (quoting 52 U.S.C. § 10304(b)). Defendants here stated explicitly that they followed a policy level decision to completely disregard race and whether the proposed

5

districts impair the voting rights of  Black Mahoning Valley voters or takes into account the findings in <u>Armour</u>.

The Voting Rights Act violations complained of herein were not  innocent mistakes. Defendants were fully  aware of their duties under the VRA, but conspired to intentionally ignore the previous finding of this Court in <u>Armour</u>  and the clear language of Section 2 in favor of partisan political advantage. Defendants intentionally discriminated by ignoring <u>Armour's</u> 15th Amendment findings and failed to follow federal VRA methodology, which specifically harmed Plaintiffs' class in a Mahoning Valley, but also generally diluted Black voting power across Ohio.

The specific intentional conduct of Defendants complained of herein should operate to invalidate the March 2 Plan because, despite having been advised of the findings of this Court in <u>Armour</u> concerning historical racial discrimination and the duty under the VRA to engage in an intensely local appraisal of indigenous political reality in Ohio and Mahoning County and the totality of circumstances test set forth in the Senate Report enacting Section 2, Defendants gave specific instructions to their staff responsible  for the drawing of district maps to disregard race, racial bloc voting or any other racial consideration  in connection with district configuration.. (See, Exhibit D for input provided by Plaintiffs to Defendants during redistricting.)

Further, support for this assertion is found in the following exchange that occurred during hearings before the Ohio Redistricting Commission on September 9, 2021.

> Ray DiRossi:  Urn, [00:03:30] I am Ray DiRossi and as was mentioned, I'm from the caucus staff for the Senate Majority Caucus and my colleague Blake Springhetti, caucus staff for the Ohio House Majority Caucus. Urn, co-chairs and distinguished members of the Redistricting Commission, it's great to be with you today.

Sykes:        Uh, thank you to the co-chairs and to Mr. Springhetti and Mr. DiRossi. Thank you, uh, for the work that you put together, uh, put, so you could present to us to get, today. Excuse me. Uh, my question is specific to, urn, how this current map complies with, uh, any provisions of the Voting Rights Act and what provisions of the Voting Rights Act [00:22:30] d- did you consider in constructing this map that you presented, or these maps that you presented today?

Ray DiRossi:  Co-chairs, Leader Sykes, thank you for the question. We did not use demographic data or racial data in the production of our maps.
Sykes: Any follow up.

Vernon Sykes: Yes, please.

Sykes:        Thank you for answering the question. Uh, so are there any provisions of the Voting Rights Act in which you considered while you drew the, or while you drew these maps [00:23:00] before us today?

Ray DiRossi: I guess I would ... Co-chairs I guess I would say it on my previous statement, we did not use racial data or demographic data for the map, but we feel that the map complies with all the provisions of the Ohio Constitution.

Sykes: Thank you. Uh, I appreciate your answer, and I, I certainly appreciate the brevity of it. Uh, can you explain why you didn't consider any parts of the Voting Rights Act in your consideration of these maps [00:23:30] before us today?

Ray DiRossi:  Well, I said we didn't consider racial data or demographic data in our maps, but we were directed not to use that data by the legislative leaders, and so we did not use it.

Audience:       (laughs)

Vernon Sykes: Yeah. [inaudible 00:23:46].

Sykes:        So I, I would count myself as a legislative leader and I don't think that I shared that information with you and I, this is not an ambush, this is simply a question. The Voting Rights Act is certainly, uh, a part of our, uh, [00:24:00] election and electoral fabric. Uh, and so really just trying to get a better idea of how we are, or not in compliance with that, with these maps. So, urn, hopefully we can have some deeper conversations about that, but, but again, thank you for your responses.

Ray DiRossi:  Thank you.

7

See, Exhibit C, DiRossi Transcript, pp. 789-790. Also see, Exhibit D for comments by President Huffman and Speaker Cupp concerning refusal to consider racially polarized voting and racial demographics.

This testimony is clear evidence that the legislative leadership in Ohio intentionally disregarded whether the proposed districts diluted Black voting strength or the existence among other things, of racial block voting.

According to Mr. DiRossi, the lead representative for defendants in the redistricting process, the Defendants intentionally decided to ignore race, and the Voting Rights Act, but also previous judicial findings of official racial discrimination in legislative districting in Ohio.  The approach to redistricting followed the Defendants, results in vote dilution, because it ignores preexisting judicial findings in Armour of racial block voting and the Senate Report factors discussed in Armour.

### D.  VOTING RIGHTS ACT

Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a language minority group. "The essence of a § 2 claim is that a certain electoral laws, practices, or structures interact with social and historical conditions to cause an inequality in the opportunities enjoyed by protected voters to elect their preferred representatives." Gingles, 478 U.S. at 47. Defendants failed to determine whether the proposed districts caused inequality despite a permanent injunction from Armour and the duty to consider the totality of circumstances. This threshold failure by Defendants warrants the entry of summary judgment on Plaintiffs' VRA claim.

1.      **TIMELINESS**

The Simon Parties exercised appropriate diligence in connection with their challenge to the current proposed Ohio 6th United States Congressional District.  On the very first day of Regional  hearings concerning the current redistricting process, August 23, 2021, Plaintiff, Reverend Kenneth L. Simon and Undersigned Counsel appeared  before the Ohio Redistricting Commission and presented a proposed map for a new congressional district for the Ohio Mahoning Valley. Exhibit E. ECF Docket #147-4, on September 14, 2021, counsel for Simon Parties appeared before the Ohio Redistricting Commission, and again presented a proposed Congressional Map on September 15,2021  See, Exhibit F – Transcript of September 15, 2021 hearing.

Because the Congressional District proposed by Defendants was adopted pursuant to a policy which gave no consideration to racial demographics, the testimony of the Simon Parties at Redistricting Hearings, the fact that the Court in Armour had found intentional violations of the 15th Amendment in *Armour*, violation of a VRA and the geographic area within by the proposed 6th Congressional District had a history of 14th and 15th Amendment violations, as discussed in the Armour Opinion, the Simon Parties filed an action in United States District Court for the Northern District of Ohio, as a case related to *Armour*, eleven days later December 1,2021, Case No. 4:21-cv-2267.

On December 13, 2021, the Simon Parties moved in the N.D. Ohio for Class Certification and a three judge district court. On December 21, 2021 Defendants moved to stay. On January 3, 2022, the Simon Parties moved the N.D. Ohio Court for an injunction prohibiting elections under the proposed 6th District Plan. On January 4, 2022, the Simon Parties filed opposition to Defendants' Motion to Stay. On January 12, 2022 the N.D. Ohio action was stayed, at the request of Defendants, in difference to litigation in the Ohio

Supreme Court. On January 14, 2022 the Ohio Supreme Court invalidated the November 20, 2021 Congressional Plan.

On February 21, 2022, in order to preserve this status under the first-to-file rule, the Simon Parties moved to Intervene in this action. On March 2, 2022, Defendants approved a new Congressional Plan.

The March 2, 2022 Plan suffered from the same defects as the November 20, 2022 Plan.  On March 23, 2022 the Simon Parties filed a Complaint in the S.D. Ohio challenging the March 2, 2022 Plan.

On March 29, 2022 in State Court litigation the Ohio Supreme Court deferred a ruling on the validity of the March 2, 2022 Congressional Plan. On March 30, 2022 the Simon Parties moved to enjoin the March 2, 2022 Congressional Plan.

### 2.    LIKELIHOOD OF SUCCESS ON THE MERITS

The Simon Parties are likely to succeed on the merits of their VRA claim because the Simon Parties satisfy the first <u>Thornbury v. Gingles</u>, 478 U.S. 30 106 S. Ct. 2752 (1986) precondition, a threshold showing that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district.

<u>Gingles</u> arose in the context of a North Carolina challenge to a multi member districting scheme. There was also a general election run off requirement, unlike Ohio where in a plurality will suffice to win an election for U.S. Representatives.

The Court in <u>Gingles</u> stated expressly it was not deciding which standards apply to other types of claims of establishing a bright line rule. The Court stated:

> We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to influence elections.

We note also that we have no occasion to consider whether the standards we apply to respondents' claims that multi-member districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of challenged multi-member districts, are fully pertinent to other sorts of vote-dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

In a different kind of case, for example a gerrymander case, plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multi-member or single member districts, with the effect of diluting the potential strength of the minority vote. *1052 Id. at 46 D. 12,106 S. Ct. at 2764 n. 12; at 50 n. 16, 1.06 S. Ct. at 276711. 16. (emphasis added).

Here the size and scope of the Simon Class has yet to be determined. However, the Simon Parties submitted a proposed District to the Defendants on September 16, 2021, Exhibit F, that suggests a district where Black voters would satisfy the first <u>Gingles</u> precondition.

According to the 2020 Census, Ohio's current population is 11, 779, 488.  See, *2020 Census*, P.L. 94-171. An Ohio Congressional district will have a representative ratio of 1:787,527 citizens.  The Simon Parties proposed a district, as indicated at Exhibit F, that instead of separating the Black community in Warren, Ohio, from the Black community in Youngstown, Ohio, two communities that have historically belonged to the same media market and standard metropolitan statistical area, due to the linkage of their histories and economics, or submerging these communities into areas south of Mahoning County, the county where Youngstown is located, the district should extend west or northwest to include additional voters with similar interests. In this manner extremely polarized racial voting will be avoided. A Black has never been elected to county wide office in Mahoning or Trumbull County.

Under the districts proposed by the Simon Parties the total voting aged white population is 333,776. The total voting aged Black population is 284,338. When this total voting block is further divided by political party, which would be required in a *Gingles* threshold condition analysis, the Simon Parties class would be sufficiently large a geographically compact to prevail in a single member election. The data in Exhibit F was complied by Dr. Mark J. Sallings, Maxine Goodman Levin College of Urban Affairs, Cleveland State University.

The Simon Parties seek relief under §2 of the VRA among other reasons  due to the history in northeast Ohio as a "pocket of discrimination."  In Youngstown alone, violations of the 15th Amendment in districting was found in Armour aside from Armour, violations of the Fourteenth Amendment due to racial discrimination were found in the police department. Williams v. Vokovich, 720 F.2d 909 (6th Cir. 1983) and in public schools Alexander v. Board of Education, 675 F.2d 787 (6th Cir. 1982). This is pointed out to say, even if Simon can not satisfy the requirements for relief under §2 of the VRA, the history of violation under the 14th and 15th Amendments would still entitle Simon to relief under §3 of the VRA. Most importantly, Defendants had a duty under the VRA once the Simon Parties brought this history to Defendants attention to at least consider it as requested on August 23, 2021 on the first day of Ohio Redistricting Commission hearings to "consider it."  Instead Defendants established a statewide policy of giving no consideration whatsoever to racial demographics, notwithstanding the requirements of the VRA and Armour being brought to their attention.

In order to avoid the need to resurrect the shameful history of treatment of descendants of persons formerly held in bondage in the United States, slaves, the VRA focused on whether a challenged voting mechanism results in the processes leading to

nomination and election not being equally open to minority voters. Defendants' policy of zero consideration of racial demographics frustrates any means to measure whether the location of a district boundary results in dilution of Black voting strength. The need to consider racial demographics in order to determine if the location of boundaries results in vote dilution was confirmed on March 29, 2022 hearing in <u>Gonadakis</u> on March 28, 2022 by Chris Glassburn, President of Project Govern in redistricting. Glassburn testified as follows concerning "results":

> Q. So given that you did have available to you, if you had elected to use it -- if the Commission had elected to use it, the ability to analyze the voting behavior of homogeneous precincts racially, the exclusion of that information, then, would prevent you from determining whether the lines that were drawn in these districts resulted in vote dilution or not. It took that ability away from you, didn't it?

> A. Without the census racial data, no, we could not look at racial data. However, we also did not have any Gingles test which is a -- which is the analyzation of racially polarized voting. We did not have any documents that suggest there was racially polarized voting that followed that Gingles criteria for any part the state.

> Q. Wouldn't it be part of the analysis of the mapmakers to look at, if the racial data was available, whether or not the lines they were recommending resulted in the processes leading to nomination or election not being equally open to black voters?

> A. No.

> Q. How could you contend -- how could you, then, determine what the results would be of a particular configuration on black voters if you did not include that in the process of determining where these district lines would be?

> A. There was no racial analysis done.

> Q. So you couldn't determine the results. Would you agree with me?

> A. Yes.

> Q. And your failure to include those results was the result of express directions given to you by the redistricting commission. Would you agree with that statement?

A. Yes. In this round and all others.

See, Exhibit G. Transcript of Glassburn Testimony.

According to the 2020 Census 13.1% of Ohio's population is Black, 1,521,462 persons. The VRA extends protection to this group not only from the effects of historical de jure racial discrimination but also de facto. Defendants blanket refusal to even consider the history provided to them by the Simon Parties, not only injured the Simon Parties, it may have resulted in the dilution of the voting strength of Blacks in other Ohio locales where on intensely local appraisal of indigenous political reality and searching evaluation of past and present conditions was totally ignored by Defendants.

In this case of Ohio, an express directive, Rule 9 on the Defendants guidance to the mapmakers and instruction to map drawers, was given by the most senior legislative officials to violate the VRA by not considering any racial demographics. This de jure discriminatory policy harmed 13% of Ohio's population, not just the Simon Parties. If Defendant's continue with this intentional disregard of §§2 and 3 of the VRA, Ohio should have its Congressional denominator reduced by 13% of the State's population, the extent to which it failed to comply with §3 of the 14th Amendment.

Defendants contend that the Simon Parties are not merely asserting an influence claim. Influence claims are not barred in the Sixth Circuit by reason of the decision in Growe v. Emison, 507 U.S. 25 (1993) and Cousins v. Sunquist, 145 F.3d 818 (6th Cir. 1998). Defendants argument is incorrect. Growe stated explicitly "to establish a vote-dilution claim with respect to a multimember district plan, a plaintiff must establish three threshold conditions." This case does not deal with a multimember districting plan. Growe was factually similar to Gingles, both involved multimember plans. Defendants also content that an influence claim is barred by Cousins v. Sundquist, 145 F. 3d 818 (6th Cir.

14

1998). Although there is dicta in <u>Cousin</u> concerning an influence claim, the decision did not turn the size of the minority voting group Plaintiffs, the decision rested on inability to meet the third <u>Gingles</u> precondition, proof of racial block voting. The claim of the Simon Parties is because of the duties imposed under §2 of the VRA and the findings in <u>Armour</u>, the Defendants' should have considered racial demographics when drafting the 6th Congressional District.

It bears mentioning that Defendants suggest that the Simon Parties should have joined the litigation in State court. The Simon Parties seek to vindicate and rely upon the findings in <u>Armour</u> as a component for their claim for relief. While the Simon Parties wholly support the 2015 Amendments to the Ohio Constitution concerning redistricting, these amendments do not provide an adequate remedy due to the endless cycle of rejection and resubmission that may, and unfortunately, is occurring.

The Simon Parties became involved in this process from its outset. They are now faced with having to vote for Congressional representative in a racially discriminatory district. Given the Defendants' malfeasance in the creation of this predicament, holding final certification of the May 3 primary in abeyance pending the outcome of litigation concerning the March 2, 2022 map is a small measure of justice to the Simon Parties who to date have had their concerns relegated to back-of-the-bus status.

<u>Growe</u> does not require a different result <u>Growe</u> counseled deference to State proceedings, where the state proceedings were an adequate remedy. Ohio's State procedure, as evidenced by the current predicament is not.

Defendants also raise <u>Purcell v. Gonzalez</u>, 549 U.S. 1 (2006). <u>Purcell</u>, stated "court orders affecting elections especially conflicting orders, can themselves result in voter confusion and consequential incentive to remain away from the policy. *Id* at 4.

Early voting has already started in Ohio. Affording  the Simon Parties a remedy on the back end is not going to effect the May 3 primary. Voters are already confused  and turn out is already low. These circumstances are due to Defendants' conduct. The Simon Parties do not seek to enjoin or disrupt an election; they request that unless the election is determined to be fair, the results should not be certified.

### 3.       IRREPARABLE HARM

Plaintiffs have suffered and continue to suffer irreparable injuries. "Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there can be no do-over and no redress.*" League of Women Voters of N.C. v North Carolina,* 769 F.3d 224, 247 (4th Cir. 2014). "The proper remedy for a legal provision enacted with discriminatory intent  Croson v. City of Richmond, 422 U.S.

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" *Scott*, 612 F.3d at 1295 (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th  Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. See, e.g., Williams v Rhodes, 393 U.S. 23,30 (1968).

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.*" United States v. Alabama,* 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th  Cir. 2010); Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987); see also Charles II. Wesley Educ. Found., Inc. v. Cox, 32*, Supp. 2d 1358, 1368 (N.D. Ga. 2004) (Cox I), aff'd, 408 F.3d 1349 (11th Cir. 2005) (Cox

16

II) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); see also United States v. Georgia, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

"Once a state legislative apportionment scheme has been found unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. Reynolds v. Sims, 377 U.S. 533 (1964).

Some form of relief is due to the Simon Parties because the State has intentionally trampled on their fundamental voting rights or irreparable harm as a matter of law.

## 4.    HARM TO OTHERS AND PUBLIC INTEREST

Enjoining the certification of the results of an unlawful election will not cause harm to others. The Simon Parties do not seek to enjoin the election, despite having been denied access to the Courts under the guise of *Growe*.

Federal courts generally have a "'virtually unflagging'" obligation to hear and decide cases within their jurisdiction. *Sprint*, 571 U.S. at 77 (quoting Colo. River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976)). Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" Id. (quoting Cohens v. Virginia, 6 Wheat. 264, 404 1821)). "Parallel state-court proceedings do not detract from that obligation"; instead, contemporaneous federal and state litigation over the same subject matter is the norm. Id. The availability of the federal courts to adjudicate federal claims is essential to protecting federal rights especially, as relevant here, the right to vote free of intentional racial discrimination.

17

**5.      PUBLIC INTEREST**

The public interest is served by enjoining certification for the reason amid the chaos created by the ongoing cycle of map rejection, voters in the Simon class will know that the irreparable harm caused an election under the current unconstitutional 6th District map may not be valid.  An injunction presents a remedy for the Simon Parties.

**E.  SUMMARY JUDGMENT IN SECTION 2 LITIGATION**

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In deciding whether there is a genuine issue of material fact, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. Anderson, 477 U.S. at 255. To determine which facts are "material," a court must look to the substantive law on which the claim rests. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine issue" is one whose resolution could affect the outcome of the action. Id. In the absence of a genuine issue of material fact, the court may enter judgment against the movant if the non-movant is entitled to judgment as a matter of law. See, e.g., Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 104 (6th Cir. 1995); Markva v. Haveman, 168 F. Supp. 2d 695, 706-07 (E.D. Mich. 2001).

In Section 2 cases, summary judgment usually "presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court." Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1348 (11th Cir. 2015). Because district courts must conduct "a searching practical evaluation of the past and present reality" in a jurisdiction, Gingles, 478 U.S. at 79, and a "comprehensive, not limited, canvassing of relevant facts," De Grandy, 512 U.S. at 1011, summary adjudication

18

is rarely possible, see, e.g., <u>Metts v. Murphy</u>, 363 F.3d 8, 12 (1st Cir. 2004). Particularly when resolution turns on "disputed issues presented by the experts' analysis," full development of the record is often necessary. <u>Mallory v. Eyrich</u>, 707 F. Supp. 947, 054 (S.D. Ohio 1989). Unlike the usual §2 case here Defendants openly concede that they ignored the totality of circumstances. Accordingly, a VRA violation should glow automatically from that failure.

Defendants actions, the total failure to even consider race, renders both the 2021 Senate and U.S. Congressional Plan invalid which warrants the issuance of a preliminary injunction. Support for this assertion is below.

Defendants began the Redistricting process with an express declaration from lead map drawer Mr. Ray DiRossi, that Ohio's legislative leadership instructed map drawers to not consider race. This unlawful policy has been followed by Defendants throughout the map drawing process and infects the Third Plan. See, Exhibit E, DiRossi, Deposition, pp. 789-790.

As recently as March 23, 2022, the Defendant Ohio Redistricting Commission reiterated its intention to craft new legislative districts without considering race and issued unlawful instructions to newly engaged experts to that effect. See, Item 9, Exhibit F, Rules issued to map drawers for 4th Round. Ironically, Defendants contend that federal law prohibits consideration of race. See, Exhibit F, Testimony of Mr. Huffman starting at 01:19:25." Federal law prohibits considerations of race …" Also see Testimony of Speaker Cupp, Exhibit C, 01:19:25. "No information like that has been submitted to the Commission." Contrary to these statements the Simon Parties submitted "information like that" to the Commission on multiple occasions, including on its initial day of hearings on August 23, 2021. Exhibit D. Simon Parties initial input.

The Fourth Plan is defective and should not been maintained or otherwise utilized because it dilutes the voting power of the Simon Parties in violation of federal law.

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" state and federal officials "who are violating, or planning to violate, federal law." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 326-27 (2015) (citing Osborn v. Bank of United States, 9 Wheat. 738, 838-39 (1824); Ex parte Young, 209 U.S. 123, 150-51 (1908); Am. Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902)). This power to enjoin unlawful "actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." Id. At 327. While Congress may prohibit courts from awarding such equitable relief, id. at 327-28, Congress need not confer the power to award such relief in order for courts to exercise that power: the power is an inherent aspect of the courts' equitable authority, see, e.g., Am. School of Magnetic Healing, 187 U.S. at 110; see also Barry v. Lyon, No. 13-cv-13185, 2015 U.S. Dist. LEXIS 174347, at *5 (E.D. Mich. June 5, 2015); In re Trump, 928 F.3d 360, 373 (4th Cir. 2019); Int'l Refugee Assistance Project v. Trump, 883 F.3d 233, 287 (4th Cir. 2018) (en banc) (Gregory, J., concurring); Sierra Club v. Trump, 929 F.3d 670, 694 (9th Cir. 2019); CNSP, Inc. v. City of Santa Fe, 755 F. App'x 845, 849 (10th Cir. 2019).

Courts must balance "four factors ... when considering a motion for a temporary restraining order: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." City of Pontiac Retired Emples. Ass'n v. Schimmel, 751 F.3d 427, 430 (6th Cir. 2014) (internal quotation marks

omitted). The standard for a permanent injunction is identical, except that the movant must show "actual success on the merits" instead of a likelihood of success on the merits. Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987). A permanent injunction is in place here via Armour.  Defendants totally ignored Armour.

The purpose of a temporary restraining order is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." United States v. Alabama, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010); Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987); see also Charles H. Wesley Educ. Found., Inc. v. Cox, 32*, Supp. 2d 1358, 1368 (N.D. Ga. 2004) (Cox I), aff'd, 408 F.3d 1349 (11th Cir. 2005) (Cox II) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); see also United States v. Georgia, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

As explained below, injunctive relief is warranted, because all four elements strongly weigh in Plaintiffs' favor. Plaintiffs are likely to succeed on the merits. They will suffer irreparable harm if the 2022 elections are conducted using constitutionally infirm districts. The balance of hardships weighs in favor of Plaintiffs as well: Ohioan's fundamental right to vote would be infringed absent an injunction, outweighing any burden that Defendant might experience in complying with the requested injunction. The requested injunction would serve the public interest because protecting the right to vote is unquestionably in the public interest.

A claim of racial gerrymandering usually requires "a two-step analysis." Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within -or without a particular district.'" Id. (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its-race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Id. at 1464.  A compelling interest may require racially gerrymandered Districts in order to comply with the Voting Rights Act. Here, whether the race required a given district structure was totally ignored.  This act itself harmed Plaintiffs in light of the locales history, as documented in the Armour Opinion and in the subsequent history of Mahoning County that Defendants totally disregard.

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" Scott, 612 F.3d at 1295 (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. See, e.g., Williams v Rhodes, 393 U.S. 23, 30 (1968).

The irreparable injury that Plaintiffs will suffer absent an injunction outweighs any harm Defendant will suffer if the requested injunction is granted. Plaintiffs will suffer irreparable injury to their fundamental right to vote absent an injunction. See Williams v. Rhodes, 393 U.S. 23, 30 (1968) ("the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms."); see also Scott, 612 F.3d at 1295 (citation omitted). By contrast, any potential harm Defendant would face under the

requested injunction would be substantially less, particularly in light of the schedule this Court has set to avoid any interference with relevant pre-election deadlines.

"If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." Fayette County, 118 F. Supp. 3d at 1349 (quoting Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974)). Indeed, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure [sic] that no further elections are conducted under the invalid plan." Reynolds, 377 U.S. at 585.

The Supreme Court has long recognized that "[t]he right to vote freely for the candidate of one's choice is of essence of a democratic society and any restrictions on that right strike at the heart of representative government." Reynolds, 377 U.S. at 555; see Williams v. Rhodes, 393 U.S. 23, 30 (1968) ("[T]he right of qualified voters…to cast their votes effectively ... rank[s] among our most precious freedoms."); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (the right to vote is "preservative of all rights"). In recognition of this fundamental principle, courts have repeatedly held that an infringement on the right to vote constitutes irreparable injury. See, e.g., Dillard, 640 F. Supp. at 1363; Harris v. Graddick, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

The requested injunction would not be adverse to public interest. Plaintiffs and the citizens of Alabama have a fundamental right to "to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968) Additionally, "the protection of 'franchise-related rights

is without question in the public interest,' and in such a situation, public interest is "best served by ensuring …that all citizens ... have an equal opportunity to elect the representatives of their choice." <u>Fayette County</u>, 118 F. Supp. 3d at 1349 (quoting x II, 408 F.3d at 1355). Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections using conditionally drawn districts and ensure that citizens of have an equal opportunity to elect the representatives of their choice; thus, the requested injunction would be in the public interest. On the contrary, allowing the 2022 election cycle to proceed with the racially gerrymandered map does not further any public interest.

It is unfortunate that Defendants chose to ignore the VRA and make it necessary to revive evidence of past racial injustices in order to demonstrate why all Senate Report factors should have been considered by Defendants when drawing district lines.

Defendants decision to not consider the racial history of Blacks and voting in Mahoning County requires resort to the type analysis the VRA was designed to avoid.

As stated in <u>Gingles</u>:

The Senate Report states that one reason the Senate Committee abandoned the intent test was that

"the Committee . . . heard persuasive testimony that the intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities."

S.Rep. at 36. The Committee found the testimony of Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights, particularly persuasive. He testified:

"[Under an intent test,] Mitigators representing excluded minorities will have to explore the motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community.

It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief."

Ibid. (footnote omitted). The grave threat to racial progress and harmony which Congress perceived from requiring proof that racism caused the adoption or maintenance of a challenged electoral mechanism is present to a much greater degree in the proposed requirement that plaintiffs demonstrate that racial animosity determined white voting patterns. Under the old intent test, plaintiffs might succeed by proving only that a limited number of elected officials were racist; under the new intent test, plaintiffs would be required to prove that most of the white community is racist in order to obtain judicial relief. It is difficult to imagine a more racially divisive requirement.

A second reason Congress rejected the old intent test was that, in most cases, it placed an "inordinately difficult burden" on § 2 plaintiffs. Ibid. The new intent test would be equally, if not more, burdensome. In order to prove that a specific factor -- racial hostility -- determined white voters' ballots, it would be necessary to demonstrate that other potentially relevant causal factors, such as socioeconomic characteristics and candidate expenditures, do not correlate better than racial animosity with white voting behavior. As one commentator has explained:

"Many of the[se] independent variables . . . would be all but impossible for a social scientist to operationalize as interval-level independent variables for use in a multiple regression equation, whether on a step-wise basis or not. To conduct such an extensive statistical analysis as this implies, moreover, can become prohibitively expensive."

"Compared to this sort of effort, proving discriminatory intent in the adoption of an at-large election system is both simple and inexpensive."

Dilution Lawsuits, 28 How.L.J. 463, 492 (1985) (footnote omitted).

The final and most dispositive reason the Senate Report repudiated the old intent test was that it "asks the wrong question." S.Rep. at 36. Amended § 2 asks instead "whether minorities have equal access to the process of electing their representatives." Ibid.

Focusing on the discriminatory intent of the voters, rather than the behavior of the voters, also asks the wrong question. All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations. Moreover, as we have explained in detail, supra, requiring proof that racial considerations actually caused voter behavior will result -- contrary to congressional intent -- in situations where a black minority that functionally has been totally excluded from the political process will be unable to establish a § 2 violation. The Senate Report's remark concerning the old intent test thus is pertinent to the new test: the requirement that a

"court . . . make a separate . . . finding of intent, after accepting the proof of the factors involved in the <u>White [v. Regester</u>, 412 U. S. 755] analysis . . . [would] seriously clou[d] the prospects of eradicating the remaining instances of racial discrimination in American elections."

## **F.  CONCLUSION**

For the above reasons, partial summary judgment should be entered in favor of Plaintiffs and a temporary restraining order issued ..

A proposed order and Exhibits are attached.

/s/ Percy Squire_____
Percy Squire (0022010)
Percy Squire Co., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
(614) 224-6528, Telephone
(614) 224-6529, Facsimile
psquire@sp-lawfirm.com
Attorney for Intervenors-Plaintiffs

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served by operation of the United States District Court, Northern District of Ohio electronic filing system, on May 7, 2024.

/s/ Percy Squire_____
Attorney for Plaintiffs (0022010)

## EXHIBIT LIST

**EXHIBIT A.**     Ohio Redistricting Commission March 28 General Assembly

**EXHIBIT B.**     Ohio General Assembly Congressional Redistricting Plan

**EXHIBIT C.**     <u>Armour v. State of Ohio</u>, 775 F. Supp. 1044 (N.D. Ohio 1991)

**EXHIBIT D.**     Plaintiffs Input to Defendants During Redistricting Process

**EXHIBIT E.**     DiRossi Deposition Transcript

**EXHIBIT F.**     Testimony of President Huffman and Speaker Cupp at March 23,

2022 Redistrict Commission Meeting and Item 9 Redistricting Rules