UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Reverend Kenneth L. Simon, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No.: 4:22-cv-612 |
| Mike DeWine, et al., | ) Three-Judge Court |
| Defendants. | ) |

**Opinion and Order**

Decided and Filed: July 1, 2024

BEFORE: LARSEN, Circuit Judge, OLIVER, and ADAMS, District Judges.

PER CURIAM. The plaintiffs in this case are Black voters from Mahoning County, Ohio. They allege that the defendants, the Ohio Redistricting Commission and certain Commission members, intentionally disregarded race in redrawing Ohio's congressional districts and drew districts that dilute Black voting strength. Plaintiffs argue that these actions violated § 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments. Plaintiffs seek a temporary restraining order, a preliminary injunction, and partial summary judgment. Defendants move to dismiss. For the reasons below, we GRANT the defendants' motion and DENY the plaintiffs' motions as moot.

I.

Ohio's most-recent attempt to draw congressional districts generated substantial litigation. *See, e.g.*, *Adams v. DeWine*, 195 N.E.3d 74 (Ohio 2022). This case concerns Ohio's operative redistricting plan, adopted on March 2, 2022. On April 15, 2022, Black voters from Mahoning

County sued the Redistricting Commission and certain Commission members, alleging that the redistricting plan violated their rights. Plaintiffs allege that defendants intentionally disregarded race in redrawing Ohio's congressional districts and drew districts that dilute Black voting strength. In support of their claims, plaintiffs present a proposed alternative district with what they label as a "determinative"—though not majority—Black vote. R. 1, PageID 19; R. 1-5. Plaintiffs make four claims premised on these allegations: one under § 2 of the Voting Rights Act, 52 U.S.C. § 10301, and three under 42 U.S.C. § 1983 based on alleged violations of their First, Fourteenth, and Fifteenth Amendment rights.

Plaintiffs also moved for appointment of a three-judge court, class certification, a temporary restraining order, a preliminary injunction, appointment of a special master, and partial summary judgment. Defendants moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district judge assigned to the case referred the defendants' motions to dismiss to a magistrate judge. The magistrate judge recommended granting the motions but noted that the court first had to resolve the plaintiffs' motion for appointment of a three-judge panel. *See* 28 U.S.C. § 2284. The court granted the defendants' motions to dismiss and denied the plaintiffs' motions, including the motion for a three-judge panel, concluding that plaintiffs had failed to present a substantial federal question over which the court had jurisdiction. *See Shapiro v. McManus*, 577 U.S. 39, 45–46 (2015). Plaintiffs appealed. The Sixth Circuit reversed the denial of the motion for a three-judge panel, vacated the other orders, and remanded. *Simon v. DeWine*, 98 F.4th 661, 666 (6th Cir. 2024). This case is now before a three-judge court. Plaintiffs have filed renewed motions for a temporary restraining order, a preliminary injunction, and partial summary judgment. Defendants responded with a renewed motion to dismiss.

II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 12(b)(6). A claim is plausible when a court could "draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678. While the plaintiffs' allegations must be taken as true, it is not enough to present "labels and conclusions," "naked assertion[s]," and "formulaic recitation[s] of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

A.

Plaintiffs first claim that defendants violated their rights under § 2 of the Voting Rights Act. Section 2 prohibits any voting standard, practice, or procedure that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation is established when, "based on the totality of the circumstances," the "political processes" are "not equally open" to members of a class of protected citizens such that "its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court announced three preconditions to stating a § 2 claim: "(1) the minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district;' (2) the minority group must be 'politically cohesive;' and (3) the majority must vote 'sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (cleaned up) (quoting *Gingles*, 478 U.S. at 50–51); *see also Allen v. Milligan*, 599 U.S. 1, 38 (2023) (recognizing that the *Gingles* preconditions apply to claims challenging single-member

districts). "[U]nless each of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" *Cooper v. Harris*, 581 U.S. 285, 287 (2017) (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)).

In support of their challenge, plaintiffs present a proposed alternative district, which they concede does *not* have a majority-Black voting-age population. That is fatal to their claim because the first *Gingles* precondition requires the ability to form a majority-minority alternative district. *See* 478 U.S. at 50–51; *see also Allen*, 599 U.S. at 18 (explaining that the first *Gingles* precondition is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district" (citation omitted)).

Plaintiffs contend, however, that the *Gingles* preconditions do not apply to their claim. They rest this assertion on *Armour v. Ohio*, 775 F. Supp. 1044 (N.D. Ohio 1991). In that case, a three-judge district court declined to apply the *Gingles* preconditions to a claim involving a proposed alternative district that, like this one, lacked a majority-minority voting-age population. *Id.* at 1051–52, 1059–60. We are not bound by *Armour*. *See* Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4235 (3d ed.) ("The decision of [a] three-judge [district] court itself carries no greater weight as precedent than any other decision of a district court."). But, like the opinions of other district courts, we consider it for its persuasive value.

The district court in *Armour* offered two reasons why it was not required to apply the *Gingles* preconditions. First, the Supreme Court had not yet decided whether the *Gingles* preconditions applied to challenges to single-member districts. *Armour*, 775 F. Supp. at 1051 (quoting *Gingles*, 478 U.S. at 46 n.12). But that door has since closed. The Supreme Court has made clear that "*Gingles* 'certainly'" governs "claims challenging single-member districts." *Allen*,

-4-

599 U.S. at 38 (cleaned up). So plaintiffs' reliance on this aspect of *Armour*'s reasoning is no longer viable.

Second, the court in *Armour* noted that the Supreme Court had, at the time, "suggested that a dilution of minority influence" over an election "may be sufficient to sustain" a § 2 claim, even if the minority group lacked sufficient strength to determine the outcome. 775 F. Supp. at 1052 (citing *Chisom v. Roemer*, 501 U.S. 380, 397 n.24 (1991)). That reasoning has also since been undermined. *See Bartlett*, 556 U.S. at 13 ("This Court has held that § 2 does not require the creation of influence districts."). So this aspect of *Armour* likewise cannot support the plaintiffs' attempt to avoid the *Gingles* preconditions.

To see this clearly, it is worth a refresher on two perennially puzzling legal concepts. First, "the terminology often used to describe various features of election districts in relation to the requirements of the Voting Rights Act." *Bartlett*, 556 U.S. at 13. And second, the rules for reading Supreme Court opinions in which no one position garners majority support. *See Marks v. United States*, 430 U.S. 188 (1977).

In *Armour*, the district court concluded that the plaintiffs had shown that Black voters could *elect* a candidate of their choice, with the help of non-minority voters. 775 F. Supp. at 1060. The Supreme Court has since labeled that a "crossover" claim—one in which the minority population is "large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13. A "crossover" claim is distinct from an "influence" claim, "in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Id.* Neither claim is cognizable under current Supreme Court precedent.

The Supreme Court barred influence claims in *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006). In that case, Justice Kennedy authored an opinion concluding, in Part IV, that the fact that Black voters had "influence in the district does not suffice to state a § 2 claim" because § 2 "requires more than the ability to influence the outcome between some candidates, *none* of whom is their candidate of choice." *Id.* at 445 (emphasis added). Three Justices signed on to Part IV. *Id.* at 408. Two Justices concurred for the reasons given in Justice Thomas's concurrence in *Holder v. Hall*, 512 U.S. 874 (1994). *LULAC*, 548 U.S. at 511–12 (Scalia, J., concurring). In *Holder*, Justice Thomas wrote that § 2 does not authorize vote-dilution claims at all. 512 U.S. at 945 (Thomas, J., concurring). When no Supreme Court opinion garners majority support, we treat the "position taken by [the Justice or Justices] who concurred in the judgment[] on the narrowest grounds" as "the holding of the Court." *Marks*, 430 U.S. at 193 (citation omitted); *see also EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 431 (6th Cir. 2020). In *LULAC*, that is Part IV of Justice Kennedy's opinion. The Supreme Court has since recognized as much. *Bartlett*, 556 U.S. at 13 (2009) ("This Court has held that § 2 does not require the creation of influence districts.") (citing *LULAC*, 548 U.S. at 445).

The Supreme Court barred crossover claims in *Bartlett v. Strickland*, 556 U.S. 1 (2009). In that case, Justice Kennedy authored an opinion concluding that § 2 does not permit crossover claims because the first *Gingles* precondition still applies, *i.e.*, the proposed alternative district must be majority-minority. *Id.* at 14–20. *Bartlett*, like *LULAC*, generated a *Marks* holding. Three Justices signed on to Justice Kennedy's opinion. *Id.* at 5. Two Justices concurred—again for the reasons given in Justice Thomas's concurrence in *Holder*—that § 2 "does not authorize any vote dilution claim, regardless of the size of the minority population in a given district." *Id.* at 26 (Thomas, J., concurring). The *Marks* holding is Justice Kennedy's conclusion that crossover

claims are not cognizable because § 2 vote-dilution claims must satisfy the *Gingles* preconditions, including the majority-minority requirement. *See, e.g.*, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 566 n.2 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012).

These cases foreclose plaintiffs' § 2 claim. Plaintiffs say that their claim is an *Armour* claim. The claim in *Armour* was what the Supreme Court would now call a "crossover" claim. *See* 775 F. Supp. at 1060. And *Bartlett* held that crossover claims are not cognizable because the *Gingles* majority-minority requirement still applies. *Bartlett*, 556 U.S. at 14–20. Plaintiffs must show that they can elect the candidate of their choice "based on their own votes and without assistance from others." *Id.* at 14. They cannot do so, so their claim fails.

Plaintiffs try to escape this conclusion by saying that we misunderstand *Armour*, and hence their claim as well. *Armour*, they say, is actually about the ability to "nominate" rather than "elect" a candidate of choice. As they put it, "*Armour* was a nomination claim." R. 20, PageID 1111–12. The relabeling does not help. Critically, plaintiffs direct us to nothing in *Armour* or any other case that suggests that the ability to nominate a candidate alone is of any § 2 significance. *See Bartlett*, 556 U.S. at 15 ("Nothing in § 2 grants special protection to a minority group's right to form political coalitions."). Rather, in *Armour*, the district court concluded that the plaintiffs had shown that Black voters could *elect* a candidate of their choice, with the help of non-minority voters. 775 F. Supp. at 1060. In the Supreme Court's current nomenclature that is a "crossover" claim; and crossover claims are not cognizable under § 2. *Bartlett*, 556 U.S. at 14–20. Therefore, we dismiss this claim.[1]

---

[1] Defendants requested permission to provide additional briefing on whether § 2 creates a private cause of action. We decline to address that question here. The issue is not one that goes to our jurisdiction, so we need not decide it, as we have instead dismissed the claim on other grounds. *See Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1217–18 (8th Cir. 2023).

B.

In addition to their claim under § 2 of the Voting Rights Act, plaintiffs bring three claims under 42 U.S.C. § 1983 based on alleged violations of the First, Fourteenth, and Fifteenth Amendments. Section 1983 creates a right of action to sue state officers for "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Id.* In other words, § 1983 "provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

1.

Plaintiffs first claim that defendants deprived them of their rights under § 2 of the Fourteenth Amendment through intentional racial discrimination. Section 2 provides:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV § 2.

Some of this section's provisions have obviously been superseded by subsequent amendments. *See* U.S. Const. amends. XIX, XXVI. But the thrust of this section is that when a state denies or abridges the right of its citizens to vote, the basis of that state's representation is to be proportionally reduced. Assuming that § 2 secures an individual right that can be enforced through § 1983, which is not at all clear, the plaintiffs lack standing to bring this claim.

In order for a federal court to adjudicate a claim, a plaintiff must have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That requires (1) an injury-in-fact to the plaintiff, (2) that the defendant caused, and (3) that a judicial decree can redress. *Id.* at 560–61. Here, we need only address redressability. *See Ames v. LaRose*, 86 F.4th 729, 732 (6th Cir. 2023).

In connection with this claim, plaintiffs seek the relief contemplated by § 2: a proportional reduction in a state's representation. U.S. Const. amend. XIV § 2. Specifically, they ask that "as a result of the intentional violation of Section 2 of the 14th Amendment by defendants the number of representatives in Ohio should be reduced to the same extent that defendants caused Ohio Black voting power to be debased." R. 1, PageID 24. But the defendants in this case are state officials who are *not* involved in the congressional apportionment process. *See* 2 U.S.C. § 2a; *Sharrow v. Brown*, 447 F.2d 94, 97–98 (2d Cir. 1971) (identifying the relevant actors as the Secretary of Commerce, the President, and the Clerk of the House of Representatives). The relief plaintiffs seek is beyond the defendants' ability to provide. And this court can "accord relief only against the [defendants]," so we cannot issue an order that would redress the plaintiffs' alleged harm. *See Lujan*, 504 U.S. at 568. That being so, we must dismiss this claim for lack of standing.

2.

Plaintiffs next claim that defendants deprived them of their rights under § 1 of the Fifteenth Amendment through intentional racial discrimination. Section 1 prohibits the denial or abridgement of the right to vote on account of race, color, or previous condition of servitude. U.S. Const. amend. XV § 1. It is not clear whether plaintiffs mean to assert a vote-dilution claim or a racial-gerrymandering claim under the Fifteenth Amendment. Nor is it clear "whether vote dilution claims are cognizable under the Fifteenth Amendment." *Backus*, 857 F. Supp. 2d at 569. Regardless, the plaintiffs' claim fails on its own terms.

Plaintiffs assert that defendants enacted the redistricting plan with the intent to deny them the right to vote on account of race. But that conclusory assertion is at odds with the plaintiffs' factual allegations. Plaintiffs allege that defendants "intentionally decided to *ignore* race" and "*did not* use demographic or racial data in the production of [their] maps." R. 1, Complaint, PageID 8–9 (emphasis added). Those allegations contradict, rather than plausibly support, a claim of intentional racial discrimination. *Iqbal*, 556 U.S. at 678. Thus, we dismiss this claim.

3.

Lastly, plaintiffs claim that defendants deprived them of their rights under the First and Fourteenth Amendments by placing an undue burden on their right to vote.

The plaintiffs' Fourteenth Amendment claim—presumably brought under the Equal Protection Clause—fails for the same reason as their Fifteenth Amendment claim. Here, plaintiffs do not even mention intentional racial discrimination. Instead, they argue that defendants placed an "undue burden" on their right to vote through "redistricting procedures that result in denial . . . of the opportunity to elect representatives of choice." R. 1, PageID 25.

But "a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, [is] required to establish that the State or political subdivision acted with a discriminatory purpose." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997) (citing *Mobile v. Bolden*, 446 U.S. 55, 66 (1980)). The complaint includes a single sentence asserting that defendants "intentional[ly] fail[ed]" to comply with the Fourteenth Amendment. R. 1, PageID 25. But a conclusory statement like that is not enough to state a plausible claim of intentional racial discrimination. *Iqbal*, 556 U.S. at 678. Accordingly, we dismiss this claim.

As for the plaintiffs' First Amendment claim, it is foreclosed by Supreme Court precedent. In *Rucho v. Common Cause*, 588 U.S. 684 (2019), the Supreme Court rejected the same claim in

the context of partisan gerrymandering. *Id.* at 713–14. The Court emphasized that "there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* That is no less true here. Moreover, the Court added that it would be inconsistent with existing precedent to permit a First Amendment claim in this context. *Id.* at 715 (citing *Vieth v. Jubelirer*, 541 U.S. 267, 294 (2004)). While *Rucho* involved partisan, rather than racial, gerrymandering, that is not a meaningful distinction under the First Amendment. As a result, we dismiss this claim.

* * *

For the reasons above, we GRANT the defendants' renewed motion to dismiss (R. 48) and DENY the plaintiffs' renewed motions for a temporary restraining order, preliminary injunction, and partial summary judgment as moot (R. 39).

## Concurrence

OLIVER, District Judge, concurring. I concur in the per curiam opinion dismissing all of plaintiffs' claims. I write separately, however, to give context to the dismissal of plaintiffs' claim under § 2 of the Voting Rights Act.

* * *

Voting is one of the most important rights that citizens enjoy. As President Johnson once said to Congress, "the first and most vital of all our rights is the right to vote" because "[i]t is from the exercise of this right that all our other rights flow." *President Lyndon Johnson's Speech to Congress on Voting Rights, March 15, 1965*, National Archives, https://perma.cc/FR3Y-CBCD. At our Nation's founding, however, "white men with property were the only Americans routinely permitted to vote." *The Founders and the Vote*, The Libr. of Cong., https://perma.cc/9NAF-SVKQ.

And while the Fifteenth Amendment changed this in theory for African-American men, *see* U.S. Const. amend. XV § 1, voting discrimination persisted in practice well into the twentieth century. Indeed, "States and localities continually contrived new rules, mostly neutral on their face but discriminatory in operation, to keep minority voters from the polls." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 691 (2021) (Kagan, J., dissenting) (internal quotation marks and brackets omitted). These rules included grandfather clauses, white primaries, poll taxes, and literacy tests, to name a few examples. *See, e.g.*, *Guinn v. United States*, 238 U.S. 347 (1915) (holding unconstitutional Oklahoma's grandfather clause); *Smith v. Allwright*, 321 U.S. 649 (1944) (holding unconstitutional white primaries in Texas); U.S. Const. amend. XXIV § 1 (outlawing poll taxes in federal elections).[2] Meanwhile, racial gerrymandering emerged, *see Gomillion v. Lightfoot*, 364 U.S. 339, 340 (1960) (describing Tuskegee, Alabama as having been altered by the State legislature "from a square to an uncouth twenty-eight sided figure," resulting in a change from a majority-Black district to one that contained only a few Blacks), and Black voters regularly faced violence and intimidation at the polls, *see* S. Poverty L. Ctr., *Ku Klux Klan: A History of Racism and Violence* 15 (Richard Baudouin, ed., 6th ed. 2011).

Faced with this history and the ongoing reality of voter suppression, Congress in 1965 passed the Voting Rights Act, which President Lyndon B. Johnson signed into law. The Act contains several provisions designed to bring about one goal: "the end of discrimination in voting in America." *Brnovich*, 594 U.S. at 691 (Kagan, J., dissenting) (quoting H. R. Doc. No. 120, 89th Cong., 1st Sess., 1-2 (1965)). One such provision outlawed literacy tests as a prerequisite for voting. 52 U.S.C. § 10101(a)(2)(C). And another provision, § 2, "guarantees that members of every

---

[2] Two years after the ratification of the Twenty-Fourth Amendment, the Supreme Court in *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966), held that poll taxes in state elections violated the Fourteenth Amendment's Equal Protection Clause.

racial group will have equal voting opportunities." *Brnovich*, 594 U.S. at 690 (Kagan, J., dissenting). It is this latter provision that underlies plaintiffs' Voting Rights Act claim here.

\* \* \*

When the Voting Rights Act became law in 1965, § 2 was a shell of its current self. As originally drafted, its language largely mirrored that of the Fifteenth Amendment. *Compare* 89 P.L. 110, 79 Stat. 437 § 2 (prohibiting practices "imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color") *with* U.S. Const. amend. XV § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."). So the Supreme Court interpreted § 2 to do nothing more than codify the Fifteenth Amendment. *Mobile v. Bolden*, 446 U.S. 55, 60–61 (1980).

Following *Bolden*, however, Congress amended § 2 to its current form. Section 2 now reads as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. This broad language, the Court has recognized, confirms "that § 2 turns on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 599 U.S. 1, 25

(2023). Accordingly, plaintiffs suing under § 2 may bring a claim for vote dilution, which typically involves either "the dispersal of blacks into districts in which they constitute an ineffective minority of voters" or "the concentration of blacks into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

In this case, plaintiffs allege the former. As they see it, Ohio's latest congressional redistricting plan runs afoul of § 2 by diluting the strength of Black voters such as them. R. 1, PageID 3–9. The § 2 violation is especially glaring, plaintiffs maintain, in their home district. That district—Ohio's sixth congressional district—encompasses the Mahoning Valley, where racial discrimination has historically "pervaded all aspects of … life." *Armour v. Ohio*, 775 F. Supp. 1044, 1054 (N.D. Ohio 1991). The effects of such discrimination are apparent to this day, as plaintiffs maintain that no Black candidate has ever been elected to even a countywide office in Mahoning or Trumbull Counties. R. 1, PageID 16; *see also Armour*, 775 F. Supp. at 1055–58 (documenting this history through 1991).

Frustrated with what they saw as yet another chapter in the "dilution of the Mahoning Valley Black vote," R. 1, PageID 17, plaintiffs sued the Ohio Redistricting Commission—the entity responsible for drawing Ohio's congressional districts—and some of its members. According to them, the Commission diluted the strength of Black voters in the Mahoning Valley by placing them in a district that featured several predominantly white counties. Section 2, plaintiffs assert, required the Commission to group the Mahoning Valley counties in a district with its "racially diverse adjacent" counties. R. 1, PageID 17. That is the crux of their claim.

To illustrate this proposed alternative district, plaintiffs attached a map to their complaint. As they have explained, this hypothetical district "would have a Black population of 284,938 and [a] White population of 333,776." R. 20, PageID 1114–15. However, as the per curiam opinion

-14-

concludes, such a district is precluded by two Supreme Court decisions: *Thornburg v. Gingles*, 478 U.S. 30 (1986), and *Bartlett v. Strickland*, 556 U.S. 1 (2009).

In *Gingles*, the Court interpreted the amended version of § 2 to prohibit vote dilution. *Gingles*, 478 U.S. at 78–80. It also identified three "necessary preconditions" that a § 2 claim must meet before a court can proceed to the statutorily prescribed "totality of circumstances" analysis. *Id.* at 50. The first of these preconditions requires "the minority group … to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* Despite this proclamation, however, the Court reserved judgment on so-called "crossover" claims, which involve proposed districts "in which minority voters make up less than a majority of the voting-age population" but can still "elect the candidate of [their] choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 12–13.

By declining to address crossover claims, the Court paved the way for the plaintiffs' success in *Armour*. Those plaintiffs—Black voters in the Mahoning Valley alleging vote dilution in the apportionment of the Ohio House of Representatives—had proposed an alternative district in which Blacks constituted only "one-third of the voting age population." *Armour*, 775 F. Supp. at 1059–60. So the *Armour* Court had to consider whether the plaintiffs' § 2 claim could proceed, notwithstanding the first *Gingles* precondition. Ultimately, it saw no reason to impose "a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress." *Id.* at 1052 (quoting *Chisom v. Roemer*, 501 U.S. 380, 403 (1991)). Black voters in the Mahoning Valley, though not a majority, could still (with the help of expected white "crossover" voters) "elect a candidate of their choosing," and that was what mattered under § 2. *Id.* at 1058–60. The court thus allowed plaintiffs' crossover claim to proceed—and ended up ruling in their

favor upon evaluating the totality of the circumstances. *Id.* at 1060. Here, plaintiffs rely heavily on *Armour* in pleading their § 2 claim. R. 1, PageID 6 (referring to themselves as "successor representatives of the class of Black voters certified in" *Armour*). However, they—and this court—must reckon with *Bartlett*.

In *Bartlett*, the Court held—in a plurality opinion authored by Justice Kennedy—that crossover claims were not cognizable because they could not satisfy the first *Gingles* precondition. *Bartlett*, 556 U.S. at 14–20. In other words, under *Bartlett*, § 2 plaintiffs must propose an alternative district in which their racial group constitutes a majority of the voting-age population, or else their claim fails. Why? Because, according to the plurality, minority racial groups "standing alone have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength." *Id.* at 14. And further, because of "the need for workable standards and sound judicial and legislative administration." *Id.* at 17.

While a blanket rule against crossover claims might "provide[] straightforward guidance to courts and to those officials charged with drawing district lines," *id.* at 18, I fear that such a rule too severely limits the ability of courts to consider all of the factors necessary to determine whether § 2 has been violated. Congress, after all, instructed courts to consider § 2 claims based on the totality of the circumstances. *Bartlett*'s majority-minority requirement, however, prevents even a large minority of voters from establishing—no matter the underlying circumstances—that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Yet there is evidence that "minority voters in districts with minority populations under 50% routinely 'elect representatives of their choice.'" *Bartlett*, 556 U.S. at 27, 32–33 (Souter, J., dissenting) (citing "empirical studies"). And as the Court had previously warned, "the *Gingles* factors cannot be applied

mechanically and without regard to the nature of the claim." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993). Nevertheless, that appears to be exactly what happened in *Bartlett*.

Justice Souter's *Bartlett* dissent raises serious concerns about the plurality opinion's interpretation of § 2. *See Bartlett*, 556 U.S. at 26–44 (Souter, J., dissenting). Among other things, it explains that, under the *Bartlett* regime, "the best way to avoid suit under § 2, and the only way to comply with § 2, is by drawing district lines in a way that packs minority voters into majority-minority districts, probably eradicating crossover districts in the process." *Id.* at 43. If Justice Souter is correct, this could lead to a more racially polarized America—clearly not a desirable result.

Despite these concerns, however, I concur in the per curiam opinion dismissing all of plaintiffs' claims, including their claim under § 2. The *Bartlett* Court held that crossover claims are not permitted, and here, plaintiffs have brought such a claim. Therefore, dismissal is appropriate. Only Congressional action—or a Supreme Court decision overruling *Bartlett*—can extend § 2's protections to plaintiffs bringing crossover claims.